STATE OF NORTH CAROLINA v. MICHAEL RAY QUESINBERRY

No. 95A88

(Filed 26 July 1989)

1. **Criminal Law § 126.3— murder—jury deliberations—consideration of parole—impeachment not allowed**

   The trial court in a first degree murder prosecution properly denied defendant's motion for appropriate relief, which was based on allegations that the jurors considered defendant's possibility of parole in their sentencing deliberations, because allowing jurors to impeach their verdict by revealing the "ideas" and "beliefs" influencing their verdict is not supported by case law, nor is it sound public policy. The denial of defendant's motion did not preclude defendant from introducing evidence to support his claim because the record shows that the court asked defense counsel if he wanted to argue the motion and defense counsel chose not to do so, believing there was a question as to jurisdiction of the trial court due to the pendency of an appeal. Moreover, neither the documents defendant attached to his motion nor testimony by jurors impeaching the verdict would have been admissible because they attacked the internal processes of the jury. N.C.G.S. § 8C-1, Rule 606(b).

   **Am Jur 2d, Trial §§ 1219 et seq.**

2. **Jury § 7.12— murder—jury selection—opposition to death penalty—excused for cause**

   The trial court did not err during jury selection in a murder prosecution by excusing three jurors for cause where all three jurors said they could not vote for the death penalty under any circumstances and each juror responded affirmatively when asked by the court whether his or her beliefs about the death penalty would substantially impair his or her ability to sit as a juror. Defendant did not request to be allowed to examine the jurors after the State made its challenges for cause and defendant has not shown that further questioning likely would have resulted in different answers.

   **Am Jur 2d, Jury § 121.**

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

**3. Criminal Law § 102.6— murder—prosecutor's closing argument**

The trial court did not err by not intervening *ex mero motu* during the prosecutor's closing argument where the assertion that defendant robbed and murdered the victim because he wanted money to buy drugs was an inference which could be drawn from the evidence.

**Am Jur 2d, Homicide § 463.**

**4. Criminal Law § 102.6— murder—prosecutor's closing argument—sending message to community**

The trial court did not err during closing arguments in a murder prosecution by not intervening *ex mero motu* where the prosecutor argued that the jury could send a message to the community.

**Am Jur 2d, Homicide § 463.**

**5. Criminal Law § 102.13— murder—prosecutor's closing argument—parole**

The prosecutor's closing argument in a murder prosecution did not suggest the possibility of parole in so direct a manner as to amount to a gross impropriety requiring *ex mero motu* intervention by the trial court.

**Am Jur 2d, Homicide § 463.**

**6. Jury § 7.14— murder—jury selection—use of peremptory challenges—reservations about death penalty**

The trial court did not err in a first degree murder prosecution by allowing the State to use peremptory challenges to exclude prospective jurors who expressed reservations about the death penalty.

**Am Jur 2d, Jury §§ 289, 290.**

**7. Criminal Law § 135.7— murder—sentencing—mitigating circumstance—requirement of unanimity**

The trial court did not err during the sentencing portion of a murder prosecution by instructing the jurors that they must be unanimous before they could find the existence of a mitigating circumstance.

**Am Jur 2d, Trial § 1054.**

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

8. **Jury § 6— murder—jury selection—motion for individual voir dire and sequestration of prospective jurors denied—no abuse of discretion**

Defendant in a murder prosecution did not show prejudice or abuse of discretion from the trial court's denial of his motion for individual voir dire and sequestration of individual jurors.

**Am Jur 2d, Trial §§ 1122 et seq.**

9. **Constitutional Law § 80— death penalty—constitutional**

N.C.G.S. § 15A-2000 is not unconstitutional.

**Am Jur 2d, Homicide § 556.**

10. **Criminal Law § 135.7— murder—sentencing—instruction on duty to return recommendation of death**

The North Carolina Pattern Jury Instruction on the jury's "duty" to return a recommendation of death is not unconstitutional.

**Am Jur 2d, Homicide § 513.0.**

11. **Criminal Law § 135.10— murder—armed robbery—death sentence disproportionate**

A death sentence in a first degree murder prosecution was not disproportionate, even though the victim was killed during an armed robbery, where defendant put a hammer in his pocket, went into a country store, and attacked a seventy-one-year-old man who had let him buy groceries and gas on credit; the attack commenced while the victim's back was turned; defendant beat the victim on his head, knocking him to the floor; defendant continued to beat the victim after the victim looked at him, hitting him on the head at least ten times; defendant then stepped over the victim to get two packs of cigarettes, then left him for dead; the victim suffered for several hours before dying, knowing that defendant, a man he had trusted and helped, had brutally beaten him; defendant disposed of the murder weapon, money, and purse, then returned to work acting no differently than when he had left; when informed that the victim had died, defendant made a remark which failed to indicate regret or remorse; and defendant denied the murder when first questioned about it.

**Am Jur 2d, Homicide §§ 552, 554, 556.**

Chief Justice EXUM concurring.

Justice FRYE dissenting as to sentence.

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a judg-
ment imposing a death sentence entered by *Freeman, J.*, at the
25 January 1988 Criminal Session of Superior Court, RANDOLPH
County. Heard in the Supreme Court 14 March 1989.

*Lacy H. Thornburg, Attorney General, by Ellen B. Scouten,*
*Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon*
*Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was first tried at the 12 June 1985 Criminal Session
of Superior Court, Randolph County. The jury found defendant
guilty of first degree murder based on premeditation and delibera-
tion and on the felony murder theory, and of robbery with a
dangerous weapon. In the sentencing hearing for the murder convic-
tion, the jury recommended the death sentence. On appeal, this
Court found no error in the guilt phase of the trial but vacated
the death sentence and remanded for a new sentencing hearing.
*State v. Quesinberry*, 319 N.C. 228, 354 S.E. 2d 446 (1987). The
evidence presented in the second sentencing hearing tended to
show the following:

On 20 July 1984, Van Buren Luther, seventy-one years old,
was working at a country store owned by his son Gary. Defendant
lived near the store. Mr. Luther had allowed defendant to buy
groceries and gas there several times on credit. Defendant owed
$33.50. On the morning of 20 July, before the murder, defendant
bought a drink on credit at the store. Around 1:37 p.m., Lisa Cox
stopped at the store and went inside to speak to Mr. Luther.
No one else was around. The front door was swinging open. She
found Mr. Luther lying unconscious on the floor behind the counter.
She went to a neighbor's house and called the rescue squad.

Herman Hogan, a volunteer fireman, received a call around
1:40 p.m. to go to the Luthers' store. He arrived at the store
less than a minute later. As he drove up he saw Mr. Luther stand-
ing in the doorway, holding onto the door casing with one hand,
waving for help. Mr. Luther was covered with blood from the
top of his head to his waist. Blood was caked thickly on his chest
and was spattered on the rest of his clothes. When Mr. Hogan
asked who had done that to him, Mr. Luther replied, "It was Michael

Quesinberry." While Mr. Hogan was treating him, Mr. Luther passed out again, vomited, then regained consciousness. He said that his head hurt so badly he could hardly stand it.

The ambulance arrived at 2:09 p.m. Gary Luther drove up around 2:20 p.m. Mr. Luther told Gary that defendant pulled up to the store in his truck, came in and asked for a pack of Marlboros, and when he turned to get the cigarettes for defendant, defendant started beating him with a hammer. Mr. Luther told Gary that he had a terrible headache. During the trip to High Point Hospital, Mr. Luther vomited four times. He remained conscious. The ambulance arrived at the hospital around 3:20 p.m. Dr. Samuel Rakestraw treated Mr. Luther in the emergency room. Mr. Luther told Dr. Rakestraw that a Mr. Quesinberry assaulted him in the store.

While he was in the hospital, Mr. Luther told his wife that defendant had driven his truck up to the store, come in, picked up a Pepsi, set it on the counter, then walked around to where he was. Defendant said he wanted two packs of Marlboros. When Mr. Luther turned to get them, defendant struck him on the head. He did not know how many times defendant hit him. Mr. Luther told his wife that his head and hand were hurting.

Around 5:15 p.m., Mr. Luther's blood pressure and heart rate dropped, and his heartbeat became irregular. Attempts to stabilize his heartbeat and blood pressure failed. At 5:53 p.m. he was pronounced dead.

Dr. Robert Thompson, a forensic pathologist, conducted an autopsy. He found a contusion on the back of Mr. Luther's left hand and more than ten lacerations on his head. There was a skull fracture in the right rear of his head and subarachnoid hemorrhaging. Dr. Thompson testified that the injuries would have been painful. He testified that the cause of death was "blunt-force injuries to the head," which were consistent with blows by a hammer.

An officer in the Randolph County Sheriff's Department arrived at the Luthers' store around 4:20 p.m. to photograph the crime scene. There was a big pool of blood on the floor behind the counter, as well as blood on the walls, the counter, the door, and the door facings. An open Pepsi bottle was on the counter, and two packs of Marlboro cigarettes were on the floor behind the counter.

Around 4:00 p.m., a North Carolina Highway Patrol officer stopped defendant in his truck about two miles from the store,

told defendant to drive to the store, and followed him there. At the store, law enforcement officers advised defendant of his constitutional rights. Defendant denied that he had done anything. Around 6:00 or 7:00 p.m., defendant was told that Mr. Luther had died. Defendant responded, "What can I say?"

Defendant gave a statement to an SBI agent around 7:00 p.m. Defendant said that he smoked a marijuana cigarette during his lunch break at work that day, then at 1:00 p.m. he told a co-worker that he was going to leave for about an hour. He went to his truck, smoked another marijuana cigarette, and drove towards his home. He went to the Luthers' store to get a drink and saw that no one was around. He thought about how broke he was and about how his baby needed diapers and other things. He saw a hammer on the floor of his truck, put it in his back pocket, then went inside the store. He got a Pepsi and asked for cigarettes. When Mr. Luther turned to get the cigarettes, he hit him on the back of his head with the hammer. Mr. Luther fell on the floor, and he hit him on the head again. He took a purse with money in it, ran to his truck, and drove off. He threw the hammer and purse out the window, stopped and hid the money under a rock, then returned to work.

After making this statement, defendant went with the officers to look for the discarded items. They were able to locate the money, $545 in cash, but did not find the bag or the hammer. Defendant said the hammer was a "ball-and-ping-type hammer" with a metal head.

Three days after the murder, defendant told the SBI Agent that after he hit Mr. Luther the first time, Mr. Luther fell and looked at him; then he hit him again. Defendant said he had planned to get his family and go to West Virginia after he robbed Mr. Luther.

On the day of the murder, defendant was employed at a furniture company. He told Jason Coggins, a co-worker, that he had something he wanted to do and asked Mr. Coggins to cover for him. Defendant left around 1:00 to 1:30 p.m. Mr. Coggins testified that defendant came back around 2:00 or 2:30 p.m., appearing no different from when he had left, and resumed his work. Defendant left work at 3:25 p.m.

Another co-worker, Jeff Williams, testified that one day in June 1984 he and defendant were sitting in front of the Luthers'

store. Defendant said it was a wonder someone had not robbed Mr. Luther because he would be an "easy old man to rob."

Defendant testified that on the day of the murder he smoked five marijuana cigarettes and drank two beers. He felt nauseated and left work to go home. He saw the store and decided to stop for some groceries. He saw the hammer in the truck and started thinking about being broke and about taking his wife to the doctor. He put the hammer in his back pocket, went inside, asked for cigarettes, then hit Mr. Luther twice on the back of his head with the hammer. Defendant denied getting a Pepsi. He testified that he considered calling for help for Mr. Luther. He got the bag of money, stepped over Mr. Luther to get the cigarettes, and ran. After leaving the store and disposing of the bag, money, and hammer, defendant returned to work. He told Jason Coggins that he had taken a nap and felt better. He thought he had killed Mr. Luther and did not think Mr. Luther had recognized him.

Defendant grew up in a coal-mining town in West Virginia. He started using drugs when he was fourteen. When his grandfather died he moved in with his grandmother to help her. He dropped out of school when he was sixteen and joined the Army at seventeen. He continued to use drugs. The Army sent him to a drug and alcohol rehabilitation center. He used drugs while in the program, so the Army discharged him. He returned home and got married. He spent one-third to one-half of his income on drugs. He was "smoking pot, doing acid, speed, and smoking hash, and cocaine every now and then." He borrowed money which he did not repay and filed for bankruptcy, then he and his wife and baby moved to Asheboro. They lived in a house rent free in exchange for repairs to the house. On the weekend before the murder, defendant asked some of his relatives for $110.

Defendant presented testimony that when he was growing up in West Virginia he worked hard and had a good reputation in his community. There was also evidence that he had no prior criminal convictions.

Dr. Brad Fisher, a clinical forensic psychologist, testified that he diagnosed defendant as being clinically depressed. He believed that defendant would not be violent to others if incarcerated, but that he might attempt to hurt himself. Dr. Fisher testified that defendant had no record of violent behavior prior to the murder and that the murder was "totally out of character." He testified

that defendant had no serious mental illness or memory problem. He believed that long-term treatment could help keep defendant from using drugs again.

In the second sentencing hearing, the jury found the only aggravating circumstance submitted: the murder was committed for pecuniary gain. The jury found seven mitigating circumstances: defendant has no significant history of prior criminal activity; prior to the murder, defendant had no history of assaultive behavior; since defendant's arrest he has adapted well to life in custody and has shown no tendencies for violence against others; defendant voluntarily confessed to the crime after being warned of his right to remain silent and without asking for or without assistance of counsel; upon his arrest, defendant cooperated with law enforcement officers; the crime was out of character for defendant; and defendant is remorseful for the crime. Upon the jury's recommendation, the trial court sentenced defendant to death. We find no error.

## SENTENCING PHASE

[1] On 12 February 1988 defendant filed a motion for appropriate relief pursuant to N.C.G.S. § 15A-1415, requesting an evidentiary hearing and a new sentencing hearing based on allegations that the jurors considered defendant's possibility of parole in their sentencing deliberations. On 25 May 1988 there was a hearing on the motion. The State moved to strike affidavits and a newspaper article which defendant had attached to the motion and to prohibit testimony by jurors. The court granted the State's motion to strike. Defendant did not present evidence. The court denied defendant's motion for appropriate relief. Defendant appeals from the denial of that motion.

The affidavits and newspaper article, submitted with defendant's motion and sealed by the trial court for review by this Court, contain statements by jurors that during deliberations they discussed that defendant might be paroled in ten years if given a life sentence. The affidavits include two affidavits of jurors and two affidavits of members of the Appellate Defender's office and the North Carolina Death Penalty Resource Center. Defendant claims that the affidavits and newspaper article show that the jurors had misconceptions about the length of time defendant would have to serve before he would be eligible for parole, and that the jurors' misconceptions were "the determining factor" in the jury's decision to recommend a death sentence rather than a life sentence. De-

fendant argues that the court erred in quashing the affidavits and newspaper article and in prohibiting testimony by jurors that during deliberations they were influenced by considerations of the possibility that defendant would be paroled if given a life sentence. He complains that his federal and state constitutional rights to confrontation, due process of law, and freedom from cruel and unusual punishment were violated.

Federal Rule of Evidence 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or any evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Fed. R. Evid. 606(b). Federal Rule 606(b) is based on the common law rule prohibiting juror testimony which would impeach a verdict, except for testimony concerning extraneous influences on the jury. *Tanner v. United States*, 483 U.S. 107, 121, 97 L.Ed. 2d 90, 106 (1987). Under the common law, federal courts used an "external/internal distinction to identify those instances in which juror testimony impeaching a verdict would be admissible." *Id.* at 117, 97 L.Ed. 2d at 104.

Federal cases[1] where courts have found "external" influences on jurors include: *Parker v. Gladden*, 385 U.S. 363, 17 L.Ed. 2d 420 (1966) (bailiff told jurors defendant was guilty and Supreme Court would correct "anything wrong" on appeal); *Turner v. Louisiana*, 379 U.S. 466, 13 L.Ed. 2d 424 (1965) (two deputy sheriffs who were key witnesses for state could not be in "continuous and intimate" association with jury); *United States v. Barnes*, 747 F. 2d

---

1. Federal cases, while not binding on the courts of this state in construing our rules of evidence, "should be looked to by the courts for enlightenment and guidance in ascertaining the intent of the General Assembly . . . ." N.C.G.S. § 8C-1, Rule 102, Commentary.

246 (4th Cir. 1984) (three unauthorized exhibits sent to jury room); *United States v. Howard*, 506 F. 2d 865 (5th Cir. 1975) (one juror told other jurors defendant had been in trouble before); *Downey v. Peyton*, 451 F. 2d 236 (4th Cir. 1971) (juror was son of jailer beaten when defendant attempted an escape). These are cases in which "extraneous prejudicial information was improperly brought to the jury's attention or . . . outside influence was improperly brought to bear upon [a] juror." Fed. R. Evid. 606(b).

"Internal" influences, however, involve information coming from the jurors themselves — "the effect of anything upon [a] juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith." Fed. R. Evid. 606(b). Federal cases finding internal influences upon the jury include: *Shillcutt v. Gagnon*, 827 F. 2d 1155 (7th Cir. 1987) (juror alleged to have made racial slur which prejudiced defendant); *United States v. Barber*, 668 F. 2d 778 (4th Cir.), *cert. denied*, 459 U.S. 829, 74 L.Ed. 2d 67 (1982) (juror allegedly threatened by foreman and coerced into verdict); *Smith v. Brewer*, 444 F. Supp. 482 (S.D. Iowa), *aff'd*, 577 F. 2d 466 (8th Cir.), *cert. denied*, 439 U.S. 967, 58 L.Ed. 2d 426 (1978) (juror alleged that other jurors told her she would be responsible if defendant was not convicted and killed someone else and that there were racial considerations during deliberations). *See also State v. Froneberger*, 55 N.C. App. 148, 285 S.E. 2d 119 (1981), *cert. denied and appeal dismissed*, 305 N.C. 397, 290 S.E. 2d 367 (1982) (three jurors allegedly "coerced" into voting for guilty verdict).

In *Tanner v. United States*, 483 U.S. 107, 97 L.Ed. 2d 90 (1987), the United States Supreme Court held that the district court did not err in denying the defendant's motion for a post-verdict evidentiary hearing based on allegations that jurors were intoxicated by drugs and alcohol during defendant's trial. The Supreme Court held that testimony by jurors that they and/or other jurors had used drugs and alcohol throughout the trial was inadmissible under Federal Rule 606(b) because the voluntary ingestion of drugs or alcohol by a juror was not an "outside" or "external" influence. *Id.* at 122, 97 L.Ed. 2d at 107. The Court stressed the importance of protecting the "internal processes of the jury" from post-verdict inquiry. *Id.* at 120, 97 L.Ed. 2d at 106. "[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by

a barrage of post verdict scrutiny of juror conduct." *Id.* at 120-21, 97 L.Ed. 2d at 106.

This Court also has distinguished between "external" and "internal" influences on jurors. In *State v. Rosier*, 322 N.C. 826, 370 S.E. 2d 359 (1988), a first degree sexual offense case with a child victim, the defendant made a motion for appropriate relief based on affidavits from four jurors. The affidavits stated that the foreman of the jury had watched a television program on child abuse which the court had specifically instructed the jurors not to watch and that some jurors did not think the defendant was guilty, but "just wanted to get him off the streets." *Id.* at 830, 370 S.E. 2d at 361-62. We examined North Carolina Rule of Evidence 606(b), which is identical to the federal rule, and stated:

> [Rule 606(b)] mean[s] that extraneous information is information dealing with the defendant or the case which is being tried, which information reaches a juror without being introduced in evidence. It does not include information which a juror has gained in his experience which does not deal with the defendant or the case being tried.

*Id.* at 832, 370 S.E. 2d at 363. We concluded that the jurors' affidavits were "not extraneous information within the meaning of Rule 606," and held that the trial court did not err in denying defendant's motion for appropriate relief. *Id.* at 832, 370 S.E. 2d at 363.

Under North Carolina Rule 606(b), as interpreted in *Rosier*, allegations that jurors considered defendant's possibility of parole during their deliberations are allegations of "internal" influences on the jury. First, the "information" that defendant would be eligible for parole in about ten years was not information dealing with this particular defendant, but general information concerning the possibility of parole for a person sentenced to life imprisonment for first degree murder. Second, there is no allegation that the jurors received information about parole eligibility from an outside source. The juror affidavits state that it was the jurors' "idea," "belief," or "impression" that defendant would be released in ten years. We have said that "[i]t would be naive to believe jurors during jury deliberations do not relate the experiences they have had," *id.*, and that "the possibility of parole or executive clemency is a matter of common knowledge among most adult persons." *State v. Cherry*, 298 N.C. 86, 101, 257 S.E. 2d 551, 561 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980). Most jurors,

through their own experience and common knowledge, know that a life sentence does not necessarily mean that the defendant will remain in prison for the rest of his life. Therefore, the jurors' "belief" about defendant's possibility of parole was an "internal" influence on the jury. See Cherry, 298 N.C. at 101, 257 S.E. 2d at 561 ("a possibility that . . . knowledge [of a defendant's eligibility for parole] might have been possessed by jurors will not permit a juror to attack and impeach his own verdict after it has been received by the court"); State v. Johnson, 298 N.C. 355, 259 S.E. 2d 752 (1979) (trial court properly excluded from record on appeal documents indicating that jury had considered possibility of parole).

Allowing jurors to impeach their verdict by revealing their "ideas" and "beliefs" influencing their verdict is not supported by case law, nor is it sound public policy.

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation — to the destruction of all frankness and freedom of discussion and conference.

Tanner v. United States, 483 U.S. 107, 119-20, 97 L.Ed. 2d 90, 105-06 (1987) (quoting McDonald v. Pless, 238 U.S. 264, 267-68, 59 L.Ed. 1300, 1302 (1915) ); State v. Cherry, 298 N.C. at 101, 257 S.E. 2d at 561.

Defendant further argues that the court's denial of his motion for appropriate relief improperly precluded him from introducing evidence to support his claim. The record shows, however, that the court asked defense counsel if he wanted to argue the motion for appropriate relief, but that he chose not to do so, believing there was a question as to the jurisdiction of the trial court to hear the motion due to the pendency of an appeal. Moreover, neither the documents defendant attached to his motion nor testimony by the jurors impeaching the verdict would have been admissible,

because they would have attacked the "internal processes of the jury." *Tanner v. United States*, 483 U.S. at 120, 97 L.Ed. 2d at 106.

We conclude that the trial court properly denied defendant's motion for appropriate relief.

[2] Defendant next contends that the trial court erred by excusing three prospective jurors for cause, due to their feelings about the death penalty, without proper inquiry as to their ability to follow the law, and by not allowing defendant to question the prospective jurors.

During jury selection, the State challenged three prospective jurors for cause due to their opposition to the death penalty. The first prospective juror said that she "couldn't render the death penalty."

MR. YATES [prosecutor]: So, you would automatically vote against the imposition of the death penalty without regard to any of the evidence in the case?

MS. CAGLE: Yes.

MR. YATES: And you would not vote in favor of the death penalty under any facts or circumstances?

MS. CAGLE: Now, I don't know that. I'm just not in favor of the death penalty.

MR. YATES: Would you say you would not vote for the death penalty under any circumstances?

MS. CAGLE: Yes.

MR. YATES: Because of your religion?

MS. CAGLE: Yes.

MR. YATES: State would challenge for cause.

COURT: Ma'am, is what you're saying because of your religious beliefs that under no set of circumstances, it doesn't matter what the facts might be, that you could not fairly even consider the death penalty?

MS. CAGLE: (No response.)

COURT: Is that what you're saying?

MS. CAGLE: Right.

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

COURT: And because of your beliefs, your religious beliefs, I believe you feel like that would substantially impair your ability to sit on this case as a juror and be fair and impartial to both sides?

MS. CAGLE: Yes.

COURT: Is that what you're saying?

MS. CAGLE: Right.

The prosecutor asked the second prospective juror whether he would be unable to vote for the death penalty under any circumstances. He responded that he felt that he would be unable to do so. The court questioned him:

COURT: Mr. Wilmouth, no matter what your beliefs are, if the — Are you saying that because of those beliefs and it really doesn't matter what they are, but because of those beliefs you couldn't even consider the death penalty?

MR. WILMOUTH: Well, really, I don't feel like I would really — I feel like it would bother me later, regardless of which way it went.

COURT: Are you saying that just because of that, you don't think that you could fairly and impartially sit on this jury and come to a fair and impartial decision because of your feelings?

MR. WILMOUTH: I don't think I could consider the death penalty, no.

COURT: You're saying you could or could not?

MR. WILMOUTH: I don't think I could and feel like — feel right.

COURT: Because of your feelings about the death penalty, do you feel that that would substantially impair and hamper your ability to sit as a juror; is that what you are saying?

MR. WILMOUTH: Yes, I do in this case.

The third prospective juror said she was against the death penalty.

MR. YATES: So you would not impose the death penalty under any circumstances?

MS. GILLETTE: I don't believe so.

MR. YATES: You would automatically vote for life imprisonment in this case no matter what the facts or circumstances?

MS. GILLETTE: Yes, sir.

MR. YATES: State will challenge for cause.

COURT: Ma'am, is what you're saying because of your feelings about the death penalty, and even regardless of your feelings about the death penalty, that no matter the facts and circumstances of any case, that you would not even consider the death penalty; is that what you're saying?

MS. GILLETTE: Yeah, it would be very difficult for me to.

COURT: It's going to be difficult for everybody, but you're saying you would not even consider it. You need to say yes, or no, she can't hear you.

MS. GILLETTE: No.

COURT: She can't take a shake of the head in the record. And you feel like those feelings that you have and beliefs would substantially impair your ability to sit on this jury and be fair and impartial, don't you?

MS. GILLETTE: Yes, sir.

In *Wainwright v. Witt*, 469 U.S. 412, 83 L.Ed. 2d 841 (1985), the United States Supreme Court held that a prospective juror may be removed for cause due to his or her views about the death penalty if those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at 424, 83 L.Ed. 2d at 851-52 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L.Ed. 2d 581, 589 (1980) ). Here, all three of the prospective jurors said they could not vote for the death penalty under any circumstances. Each juror responded affirmatively when asked by the court whether his or her beliefs about the death penalty would substantially impair his or her ability to sit as a juror. Therefore, the trial court did not err in excusing them for cause.

Defendant argues that the trial court erred by not allowing him to examine each prospective juror before he or she was excused. However, the record shows that defendant did not request

to be allowed to examine the jurors after the State made its challenges for cause. Additionally, defendant has not shown that he could have rehabilitated any of the prospective jurors. We stated in *State v. Reese*, 319 N.C. 110, 353 S.E. 2d 352 (1987):

> When challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged.

*Id.* at 120-21, 353 S.E. 2d at 358 (quoting *State v. Oliver*, 302 N.C. 28, 40, 274 S.E. 2d 183, 191 (1981)). Defendant has not shown that further questioning likely would have resulted in different answers by the prospective jurors concerning their feelings about the death penalty. Their answers to questions from the prosecutor and the court showed that they could not fulfill their duty as jurors. We therefore hold that the trial court did not abuse its discretion.

[3] Defendant next contends that the court erred in not intervening in portions of the prosecutor's closing argument. Defendant did not object to the portions of the argument to which he now assigns error. Therefore, "review is limited to an examination of whether the argument was so grossly improper that the trial [court] abused [its] discretion in failing to intervene *ex mero motu.*" *State v. Gladden*, 315 N.C. 398, 417, 340 S.E. 2d 673, 685, *cert. denied*, 479 U.S. 871, 93 L.Ed. 2d 166 (1986).

First, defendant argues that the prosecutor made assertions that were not supported by the evidence. The prosecutor argued that the reason defendant robbed and murdered Mr. Luther was because he wanted money to buy drugs. The prosecutor also argued that defendant gave as his reason for killing the victim that he wanted money to buy drugs. Defendant claims that there is no evidence supporting either argument.

We have stated that "[a] prosecutor in a criminal case is entitled to argue vigorously all of the facts in evidence, any reasonable inference that can be drawn from those facts and the law that is relevant to the issues raised by the testimony." *State v. Maynard*, 311 N.C. 1, 14-15, 316 S.E. 2d 197, 205, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984). Defendant claimed that he needed money to buy diapers and other things for his baby. However, the

evidence showed that Mr. Luther had let defendant buy grocery items at the store on credit. Defendant admitted that he was addicted to drugs and that before the murder he was spending a large portion of his salary on drugs. An inference can be drawn from this evidence that defendant beat and robbed Mr. Luther to get money for drugs. We thus conclude that the prosecutor's argument was not so grossly improper that the court abused its discretion in failing to intervene *ex mero motu.*

[4] Second, defendant argues that the prosecutor improperly appealed to community sentiment by suggesting that only a death sentence would prevent this type of crime. The prosecutor said, "Send a message that, yes, anybody out there like Mr. Quesinberry that can show that he doesn't have a prior record, and if he gets on drugs, he's not responsible. He's not responsible." The prosecutor went on to tell the jurors, "[W]hen you think about [the circumstances of the killing], then you will do your duty, and you will find that this type of murder is not allowed in Randolph County. Not allowed in this State." Defendant argues that this type of argument is prejudicial under *State v. Scott,* 314 N.C. 309, 333 S.E. 2d 296 (1985). There, we held that the prosecutor's argument to the jury was improper because it " 'ask[ed] the jury to lend an ear to the community rather than a voice.' " *Id.* at 312, 333 S.E. 2d at 298 (quoting *Prado v. State,* 626 S.W. 2d 775, 776 (Tex. Crim. 1982) ). Here, instead, the prosecutor asked the jury to send a message to the community, not to "lend an ear to the community." Therefore, the trial court properly did not intervene *ex mero motu* in the prosecutor's argument. *See State v. McNeil,* 324 N.C. 33, 52-53, 375 S.E. 2d 909, 920-21 (1989) (prosecutor's argument to the jurors during the sentencing hearing asking what message they would send to the community did not require *ex mero motu* intervention).

Third, defendant claims that the following argument by the prosecutor was improper:

The law says if it's a brutal, vicious killing for money, then the punishment is the death penalty. When you think about mercy, you think about the mercy—the mercy this person right here, this killer, this murderer showed Mr. Luther when Mr. Luther turned and looked at him. And you think about the mercy he showed. Think about the extra blows he delivered. I think when you think about that, then you will do your

duty, and you will find that this type of murder is not allowed in Randolph County. Not allowed in this State. And certainly not allowed for the reason that the defendant gives for killing Mr. Luther, money to buy drugs.

Even assuming that the prosecutor's statements here were improper, the impropriety was not so gross that the trial court abused its discretion by not intervening *ex mero motu*.

[5] Finally, defendant argues that the prosecutor improperly suggested to the jury that defendant could be released from prison if given a life sentence. The prosecutor argued, "When you go back and you try to decide, I'm not going to give any mercy; I'm not going to let him, as his wife says, go back to his little kids, they depend on him." His argument referred to defendant's wife's statement, "I hope [defendant's] appeal does go through, 'cause he's got two . . . little boys that needs him," and her testimony that she took the boys to see their father.

We have found that a prosecutor's arguments to the jury during a capital sentencing proceeding that "you are the only thing standing between [the defendant] and freedom to walk around again" and "the only way you can ever be sure this man will never walk out again is to give him the death penalty" were not improper because he "never used the word parole nor did he tell the jury that if defendant received a life sentence he could be out in twenty years." *State v. Johnson*, 298 N.C. 355, 366-67, 259 S.E. 2d 752, 760 (1979); *see also State v. Hunt*, 323 N.C. 407, 427-28, 373 S.E. 2d 400, 414 (1988); *State v. Brown*, 320 N.C. 179, 201, 358 S.E. 2d 1, 13-14 (1987). Likewise, the prosecutor's argument here did not "suggest the possibility of parole in so direct a manner as to amount to a gross impropriety requiring *ex mero motu* intervention by the trial court." *State v. Hunt*, 323 N.C. at 428, 373 S.E. 2d at 414.

[6] Defendant next contends that the trial court erred in allowing the State to use peremptory challenges to exclude prospective jurors who expressed reservations about imposing the death penalty. He argues that such a use of peremptories denied him his Sixth Amendment right to trial by an impartial jury composed of a fair cross-section of the community. We have rejected this argument. *State v. Parks*, 324 N.C. 94, 99, 376 S.E. 2d 4, 8 (1989); *State v. Fullwood*, 323 N.C. 371, 381-83, 373 S.E. 2d 518, 525-26 (1988). Defendant argues that we should reconsider this position in light of *Brown v.*

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

*Rice*, 693 F. Supp. 381 (W.D.N.C. 1988). When *Parks* was before this Court for consideration, defense counsel there filed a memorandum of additional authority citing *Brown*. We thus were cognizant of *Brown* when we rendered our decision in *Parks*. We continue to find defendant's argument unpersuasive and adhere to our prior decisions.

Defendant raises the following "preservation" issues:

[7] (1) He contends that the trial court erred in instructing the jurors that they must be unanimous before they could find the existence of a mitigating circumstance. Defendant bases this argument on *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988). For the reasons expressed in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L.Ed. 2d 180 (1989), we reject this argument.

[8] (2) He contends that the trial court erred in denying his motion for individual voir dire and sequestration of prospective jurors. It is in the trial court's sound discretion whether to allow individual voir dire and sequestration. *State v. Murphy*, 321 N.C. 738, 365 S.E. 2d 615 (1988). Defendant has not shown any prejudice or abuse of discretion. Therefore, this assignment of error has no merit.

[9] (3) He contends that N.C.G.S. § 15A-2000 is unconstitutional. This argument is without merit. *State v. Fullwood*, 323 N.C. 371, 400, 373 S.E. 2d 518, 535 (1988).

[10] (4) He contends that the North Carolina Pattern Jury Instruction unconstitutionally imposed on the jury a "duty to return a recommendation of death if it found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the death penalty. This argument is without merit. *State v. Robbins*, 319 N.C. 465, 515, 356 S.E. 2d 279, 308-09, *cert. denied*, 484 U.S. 918, 98 L.Ed. 2d 226 (1987).

PROPORTIONALITY REVIEW

[11] Because we have found no error in the sentencing phase, and on the prior appeal found no error in the guilt phase, we are required to review the record and determine: (1) whether the record supports the jury's findings of the aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion,

prejudice, or any other arbitrary factor; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Fullwood*, 323 N.C. 371, 401, 373 S.E. 2d 518, 536 (1988).

The jury found, as an aggravating circumstance, that the murder was committed for pecuniary gain. N.C.G.S. § 15A-2000(e)(6) (1988). We hold that the evidence supports this aggravating circumstance. We further conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

In conducting proportionality review, we "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. 40, 70, 337 S.E. 2d 808, 829 (1985), *cert. denied*, 476 U.S. 1165, 90 L.Ed. 2d 733 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E. 2d 373 (1988). We use the "pool" of similar cases as defined in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). *Id.* However, "[w]e do not find it necessary to extrapolate or analyze *in our opinions* all,' or any particular number, of the cases in our proportionality pool." *State v. Robbins*, 319 N.C. 465, 529, 356 S.E. 2d 279, 316, *cert. denied*, 484 U.S. 918, 98 L.Ed. 2d 226 (1987) (emphasis in original).

The jury found one aggravating circumstance—the murder was committed for pecuniary gain. The jury found seven mitigating circumstances: defendant has no significant history of prior criminal activity; prior to the murder, defendant had no history of assaultive behavior; since defendant's arrest he has adapted well to life in custody and has shown no tendencies for violence against others; defendant voluntarily confessed to the crime after being warned of his right to remain silent and without asking for or without assistance of counsel; upon his arrest, defendant cooperated with law enforcement officers; the crime was out of character for defendant; and defendant is remorseful for the crime.[2]

---

2. Defendant also submitted the following mitigating circumstances, which the jury refused to find:

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

Defendant argues that in the cases in the pool in which the defendants killed their victims during armed robberies, most of the juries imposed life sentences rather than death sentences. Moreover, defendant argues that in almost all the robbery-murder cases in which we have affirmed the death sentence, the jury found as an aggravating circumstance that the defendant engaged in a course of conduct which included the commission by the defendant of other crimes of violence against another person or persons, and/or that the murder was especially heinous, atrocious, or cruel. Defendant points out that neither of those aggravating circumstances is present here.

Although we compare this case to similar cases in the proportionality "pool," our responsibility in proportionality review is to evaluate each case independently, considering " 'the individual defendant and the nature of the crime or crimes which he has committed.' " *State v. Lloyd*, 321 N.C. 301, 322, 364 S.E. 2d 316, 329-30, *judgment vacated and remanded*, --- U.S. ---, 102 L.Ed. 2d 18, *judgment reinstated*, 323 N.C. 622, 374 S.E. 2d 277 (1988) (quoting *State v. Pinch*, 306 N.C. 1, 36, 292 S.E. 2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983) ). We have refused to evaluate a defendant's sentence by mathematical or statistical comparisons. *Id*. at 322, 364 S.E. 2d at 330. "[Although] certain aggravating circumstances usually are present in death-affirmed cases, . . . we do not consider their presence crucial to affirmation of a jury's recommendation of a death sentence." *State v. Greene*, 324 N.C. 1, 29, 376 S.E. 2d 430, 447 (1989). Further, we give the decision of the jury great deference in determining whether a death sentence is disproportionate. *Id*. at 32, 376 S.E. 2d at 449. Therefore, we cannot conclude that simply because this case involves a robbery-murder, and many juries have returned life sentences in such cases, the death sentence here is disproportionate.

Defendant compares this case to several "robbery-murder" cases in which the juries recommended life sentences. In *State v. Atkinson*,

---

The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired because he was under the influence of drugs;

The age of the defendant at the time of the murder; and

Any other circumstances arising from the evidence.

298 N.C. 673, 259 S.E. 2d 858 (1979), *overruled on other grounds*, *State v. Jackson*, 302 N.C. 101, 273 S.E. 2d 666 (1981), an owner of a grocery store was found beaten and robbed. He was bleeding from his head. There was blood inside and outside the store. After being taken to the hospital, the victim died. In *State v. Massey*, 316 N.C. 558, 342 S.E. 2d 811 (1986), the defendant and his brother robbed a country store. The owner of the store was found shot to death. In *State v. Miller*, 315 N.C. 773, 340 S.E. 2d 290 (1986), the defendant and two other men robbed a convenience store, shot and wounded the clerk, ran from the store, robbed some people who had driven into the parking lot, then shot one of them. In *State v. Wilson*, 313 N.C. 516, 330 S.E. 2d 450 (1985), the defendant and another man robbed and stabbed to death the manager of a motel.

The cases defendant cites are all distinguishable from the case at bar. First, the guilty verdicts in all four cases were based only on the felony murder theory, not on premeditation and deliberation as well, as in the present case. Moreover, there are other important distinctions. In *Atkinson* there was no evidence that the defendant himself actually beat the victim; rather, he was found guilty of murder on an acting in concert theory. In *Massey* the defendant was eighteen years old and was mildly mentally retarded, with a mental age of ten or eleven. In *Miller* there was no evidence that the defendant fired the fatal shot; he was convicted on an acting in concert theory. Although the evidence showed that he asked two other men to help him rob the store, he also warned them not to shoot anyone. In *Wilson* there was no evidence that the defendant himself stabbed the victim; he was convicted on an acting in concert theory.

This case is also distinguishable from the seven cases in which this Court has found the death sentence disproportionate. In *State v. Benson*, 323 N.C. 318, 372 S.E. 2d 517 (1988), the jury found the same aggravating circumstance found here—pecuniary gain. The jury found several mitigating circumstances: the defendant had no significant history of prior criminal activity; the defendant was under the influence of mental or emotional disturbance; the defendant confessed and cooperated upon arrest; the defendant voluntarily consented to searches of his home, car and motel room; and the defendant was abandoned by his natural mother at an early age. Although the aggravating and mitigating circumstances in *Benson* are almost the same as the aggravating and mitigating circumstances here, the murder in *Benson* was far less brutal than

this murder. The evidence in *Benson* was that the defendant shot his victim in his legs "rather than a more vital part of his body," tending to show that he "intended only to rob," not to kill. *Id.* at 329, 372 S.E. 2d at 523. Here, however, defendant beat his victim on the head with a metal hammer and left thinking he had killed him. Further, in *Benson* the defendant was convicted only on a felony murder theory, and there was little or no evidence that he premeditated and deliberated the killing. Here, defendant was convicted on a premeditation and deliberation theory, as well as on a felony murder theory, and the evidence supports the finding of premeditation and deliberation.

*State v. Stokes*, 319 N.C. 1, 352 S.E. 2d 653 (1987), is also distinguishable from this case. First, the defendant there was only seventeen years old. Second, there was no evidence showing who was the leader in the robbery or that the defendant deserved death any more than an older participant who received a life sentence. Third, the defendant was convicted only on a felony murder theory.

*State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986), *overruled on other grounds, State v. Vandiver*, 321 N.C. 570, 364 S.E. 2d 373 (1988), is distinguishable because the defendant there apparently shot the victim while attempting to shoot another person with whom he had argued on several occasions. In contrast, defendant here entered the store with a weapon and attacked his intended victim without provocation.

In *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985), the defendant and two other men went to the victim's home, where they robbed and murdered him. Defendant and one of the men stabbed the victim. The jury found as aggravating circumstances that the murder was committed (1) for pecuniary gain and (2) during the course of a robbery or burglary.[3] The jury found one or more of the submitted mitigating circumstances. This case is distinguishable from *Young*. First, the defendant in *Young* was only nineteen years old at the time of the crime; defendant here was twenty-two. Second, there was medical testimony that the victim in

---

3. We held in *State v. Quesinberry*, 319 N.C. 228, 354 S.E. 2d 446 (1987), that the court erred in submitting both of these aggravating circumstances to the jury because "in the particular context of a premeditated and deliberate robbery-murder where evidence is presented that the robbery was attempted or effectuated for pecuniary gain," the submission of both circumstances is redundant. *Id.* at 239, 354 S.E. 2d at 453. That issue was not raised in *Young*.

*Young* probably died shortly after being stabbed. Here, the victim suffered for several hours before he died. Third, there was no evidence that the victim and the defendant in *Young* had an ongoing relationship such that the victim should not have been on guard when the defendant and his accomplices came to his home. Here, however, the victim was particularly vulnerable to defendant's attack. He had extended credit to defendant, which indicates that he trusted defendant. Thus, when defendant entered the store to murder him, the victim had no reason to be particularly cautious.

In *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984), the defendant shot and killed a police officer. That case is distinguishable because there was no clear evidence of how the crime took place and what the defendant was doing before he encountered the officer. Further, the shooting occurred quickly. There was no long, brutal assault on the victim as there was here.

In *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983), the defendant shot the victim while they were riding in a car. After the shooting, he directed the driver to go to the hospital, then went inside to get medical treatment for the victim. Here, defendant showed no such concern for his victim's life. He testified that he thought about calling for help for his victim; instead, he stepped over his victim to get the cigarettes he had asked for. When law enforcement officers informed him that the victim had died, defendant answered, "What can I say?" His later expressions of remorse at trial are not comparable to the actions of the defendant in *Bondurant*.

In *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983), the defendant climbed in the victim's truck and rode off with him after the victim offered to help the defendant with his car. The victim's body was found with two gunshot wounds to the head. *Jackson* is distinguishable from this case because in that case there was no evidence that the defendant had brutally attacked the victim. Here, the evidence showed a brutal, relentless attack.

While dissimilar to the facts of the above cases, the facts of this case are similar to those of two other cases in the pool in which the defendants beat their victims to death—*State v. Greene*, 324 N.C. 1, 376 S.E. 2d 430 (1989), and *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985). In both cases we held that the death sentence was not disproportionate.

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

In *Greene* the defendant beat his father to death with a gun to secure an inheritance. The defendant inflicted numerous wounds to his father's face, chest, mid-back, and shoulders. After the killing defendant threw his own bloody clothes and the gun into a river. The jury found the defendant guilty on the theory of premeditation and deliberation as well as on the felony murder theory. The only aggravating circumstance the jury found was that the murder was committed during a robbery with a dangerous weapon. The jury found four mitigating circumstances: the defendant's I.Q. of eighty-one placed him in the lowest ten percent of the population; the defendant was a model prisoner in jail while awaiting trial; the defendant was a person of good behavior except when he was drinking alcohol; and the catch-all circumstance of "any other circumstance or circumstances which you the jury deem to have mitigating value." *Greene*, 324 N.C. at 23-24, 376 S.E. 2d at 444.

In our proportionality analysis, we distinguished *Greene* from other robbery-murder cases on the basis that the defendant killed his father.

> The victim was in a position of enhanced vulnerability because the victim and defendant were closely related, defendant lived nearby, the two frequently spent time together, and the victim thus had no reason to be on guard against harm at defendant's hand. . . . The pathologist testified that the blow to the head was the cause of death. Thus, defendant killed his father for a pecuniary motive while his father had his back turned. The evidence showed that defendant inflicted further blows on the victim, then dragged the body to the stairs, attempting to make the murder look like an accident. These actions show a meanness on the part of a mature, calculating adult without remorse for his crime or mercy towards his victim.

*Id.* at 26, 376 S.E. 2d at 445. We disagreed with the defendant's portrayal of his case as a typical robbery-murder, stating that "the crime is more accurately described as a premeditated and deliberated robbery-murder of a parent by a child, executed by a brutal beating until death resulted." *Id.*

This case is similar to *Greene*. Defendant hit the victim on the head with a metal hammer when the victim turned his back. Defendant continued to hit the victim on his head even after he had knocked him to the floor. He then took money from the cash register, left, disposed of the murder weapon and the purse, and hid

STATE v. QUESINBERRY

[325 N.C. 125 (1989)]

the money. Although defendant did not kill his father, as the defendant in *Greene* did, the victim here was also "in a position of enhanced vulnerability" because of his prior dealings with defendant. As recently as the morning of the murder, the victim had allowed defendant to purchase a drink on credit. He thus had less reason to be on guard when defendant entered the store than when dealing with customers with whom he had no ongoing credit relationship.

In *Huffstetler* the defendant beat his sixty-five-year-old mother-in-law to death with a frying pan. There, the jury found one aggravating circumstance — that the murder was especially heinous, atrocious, or cruel. The jury found three mitigating circumstances: the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; the killing occurred contemporaneously with an argument and by means of an instrument acquired at the scene and not taken there; and defendant did not have a history of violent conduct.

There are several similarities between the murder in *Huffstetler* and the murder here. There, the defendant hit his victim on her head and shoulders with a frying pan fourteen times, and left her lying in a pool of blood. The victim had multiple wounds and lacerations on her head and body, as well as a skull fracture and a hemorrhage in her brain. The defendant disposed of the murder weapon and other evidence of the crime — his bloody clothes — as defendant did here. One difference between *Huffstetler* and this case is that the defendant there did not take a weapon with him to the scene, but picked up a frying pan and beat the victim after an argument. Defendant here, however, with no provocation, calculated the murder and carried the murder weapon with him into the store. In *Huffstetler*, we said that the crime was "a senseless, unprovoked, exceptionally brutal, prolonged and murderous assault by an adult male upon a sixty-five year old female in her home." *Huffstetler*, 312 N.C. at 118, 322 S.E. 2d at 126. Here, the crime was "a senseless, unprovoked, exceptionally brutal, prolonged and murderous assault" on a seventy-one-year-old man in his place of business where he had maintained an ongoing creditor-debtor relationship with defendant.

In summary, the facts here show a particularly brutal and senseless crime. Defendant put a hammer in his pocket, went into a country store, and attacked a seventy-one-year-old man who had

let him buy groceries and gas on credit. The attack commenced while the victim's back was turned. Defendant beat the victim on his head, knocking him to the floor. After the victim looked at him, defendant continued to beat him, hitting him on the head at least ten times. After thus beating his victim, defendant stepped over him to get two packs of cigarettes, then left him for dead. The victim suffered for several hours before dying, knowing that defendant, a man he had trusted and helped, had brutally beaten him. Defendant disposed of the murder weapon, money, and purse, then returned to work, acting no differently than when he had left. When the authorities informed defendant that the victim had died, defendant made a remark which failed to indicate regret or remorse. When the authorities first questioned defendant about the murder, he denied it. Under these circumstances, considering both the crime and the defendant, we cannot hold as a matter of law that the death sentence was disproportionate or excessive. *Robbins*, 319 N.C. at 529, 356 S.E. 2d at 317.

No error.

Chief Justice EXUM concurring.

I concur with the majority's treatment of all issues.

If the Court were addressing for the first time the mitigating circumstance unanimity instruction issue, I would agree with defendant's position that these instructions violate the Eighth Amendment to the federal constitution as that amendment was interpreted in *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), for the reasons stated in my dissenting opinions in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L.Ed. 2d 180 (1989), and *State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988). The majority's position on this issue is, as a result of the Court's decisions in *McKoy* and *Allen*, the law of this state to which I am now bound. For this reason I concur with the majority's treatment of this issue.

Justice FRYE dissenting as to sentence.

In upholding the death sentence in this case, the majority relies on *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12 (1988), *cert. granted*, --- U.S. ---, 103 L. Ed. 2d 180 (1989), in which this Court rejected defendant's contention that the trial court erred in in-

structing the jurors that they must be unanimous before they could find the existence of a mitigating circumstance. A significant question involved in this case is whether the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L. Ed. 2d 384 (1988), applies to the North Carolina death sentencing scheme. Accordingly, for the reasons stated in the Chief Justice's dissenting opinions in *State v. McKoy*, 323 N.C. 1, 372 S.E. 2d 12, and in *State v. Allen*, 323 N.C. 208, 372 S.E. 2d 855 (1988), I continue to believe that the United States Supreme Court's decision in *Mills v. Maryland*, 486 U.S. ---, 100 L. Ed. 2d 384, is applicable to the North Carolina death sentencing procedure. I therefore dissent from that portion of the Court's opinion which rejects defendant's request for a new sentencing hearing.