Kenneth Bernard ROUSE,
Petitioner–Appellant,

v.

R.C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
Respondent–Appellee.

No. 01–12.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 24, 2002.

Decided Jan. 7, 2003.

**ARGUED:** Milton Gordon Widenhouse, Jr., Rudolf, Maher, Widenhouse & Fialko, Chapel Hill, North Carolina, for Appellant. Clarence Joe DelForge, III, Assistant Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Robert M. Hurley, Center for Death Penalty Litigation, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General, William N. Farrell, Jr., Senior Deputy Attorney General, North Carolina Department of Justice, Raleigh, North Carolina, for Appellee.

Before WILLIAMS, MOTZ, and KING, Circuit Judges.

Vacated and remanded by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge KING joined. Judge WILLIAMS wrote a dissenting opinion.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge.

In this federal habeas petition, his first, Kenneth Bernard Rouse seeks relief on the ground, *inter alia*, that a juror who voted to convict and execute him deliberately concealed bias in order to win a seat on the jury. The district court held that Rouse's former lawyers filed this petition one day late and that Rouse presented no grounds for equitably tolling the applicable statute of limitations. Accordingly, the court dismissed Rouse's petition as untimely, denying him all federal habeas relief. Rouse appeals, challenging the determination that his petition was not timely filed and the refusal of equitable tolling. Although we agree that Rouse filed his petition one day late, given the exceptional circumstances in this case, we believe that the district court erred in refusing to toll the limitations period. Accordingly, for the reasons set forth within, we grant a certificate of appealability, vacate the judgment of the district court, and remand for further proceedings consistent with this opinion.

### I.

At the outset, we emphasize the extremely early stage and sparse record of this case as it reaches us. The district court denied Rouse's petition as untimely on the basis of a record that did not even include the decision of the state post-conviction court, the dispositive decision for federal habeas review. We do not suggest any irregularity in this omission. The habeas rules only require the government to submit the state post-conviction court's decision at a later stage of the litigation. *See*

Fed. R. Governing Section 2254 Cases 2, 5. Nevertheless, the record presented to the district court was sparse indeed.

That limited record reveals that a North Carolina jury convicted Rouse, an African–American, of the brutal first degree murder, armed robbery, and attempted rape of a sixty-three-year-old white woman, Hazel Colleen Broadway. The same all-white jury then sentenced Rouse to death. On direct appeal, the Supreme Court of North Carolina affirmed Rouse's conviction and sentence. *See State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994).

The record further reveals that, at some time after sentencing, Rouse discovered new evidence that the mother of one member of the jury that decided his fate had been sexually assaulted and murdered, also in connection with a robbery, by a man who was later executed for her murder.[1] When all prospective jurors were asked for such information at voir dire, the victim's son had remained silent.

After serving on Rouse's jury, this juror allegedly stated that he had intentionally concealed his mother's tragic death and carefully crafted his other responses to voir dire questions, because he wanted to be on the jury that judged Rouse. Moreover, this juror assertedly expressed intense racial prejudice against African–Americans, calling them "niggers" and opining that African–Americans care less about life than white people do, and that African–American men rape white women in order to brag to their friends. Because the juror did not reveal his own family's tragedy or his apparent deep-seated racial prejudice, Rouse had no opportunity to object to the juror or challenge his ability to judge and sentence Rouse impartially.

---

1. In support of his contentions as to juror bias, Rouse submitted with his habeas petition an affidavit and a reported state case that partially corroborates a number of the details in the affidavit. *See Ezzell v. State*, 88 So.2d 280 (Fla.1956) (en banc).

Rouse collaterally attacked the state court judgment, citing this juror bias, *inter alia*, by timely filing a motion for appropriate relief in state court. Without a hearing, the state court denied post-conviction relief, but the Supreme Court of North Carolina granted certiorari and remanded the case for reconsideration. *See State v. Rouse*, 348 N.C. 508, 510 S.E.2d 669 (N.C. 1998). The state post-conviction court again denied relief without holding a hearing, and the Supreme Court of North Carolina denied Rouse's second petition for certiorari on February 5, 1999.[2] Rouse did not seek rehearing of this second denial in the state supreme court.

On February 8, 2000, Rouse filed a petition for a writ of habeas corpus in the district court, pursuing a number of claims. In particular, he contended that the juror's racial bias and personal prejudice based on his family history had denied Rouse his right to a fair and impartial jury under the Sixth Amendment.

The State moved to dismiss the petition as untimely, under the one-year statutory deadline set forth in the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* 28 U.S.C.A. § 2244(d) (West Supp. 2002). Reviewing the motion, a magistrate judge noted that because AEDPA's deadline fell on Saturday, February 5, 2000, *see id.* § 2244(d), Federal Rule of Civil Procedure 6(a) extended the deadline to the next working day, Monday, February 7, 2000. *See Hernandez v. Caldwell*, 225 F.3d 435, 439 (4th Cir.2000). The magistrate judge therefore concluded that the petition filed on Tuesday, February 8 was late—but only one day late. The magistrate judge nevertheless rejected Rouse's equitable tolling arguments, and recommended that the district court grant the State's motion

to dismiss. The district court accepted the recommendation, dismissed the petition, and denied a certificate of appealability.

## II.

■ The Supreme Court has directed that when, as here, a district court "denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Thus, "[d]etermining whether a COA should issue where the petition was dismissed on procedural grounds has two components, one directed at the underlying constitutional claims and one directed at the district court's procedural holding;" each is part of a "threshold inquiry." *Id.* at 484–85, 120 S.Ct. 1595.

■ Rouse, like the petitioner in *Slack*, "did not attempt to make a substantial showing of the denial of a constitutional right, instead arguing only that the District Court's procedural rulings were wrong." *Id.* at 485, 120 S.Ct. 1595. In *Slack*, moreover, because the constitutional claim "was neither briefed nor presented below," the Supreme Court confined its inquiry to the "second component" of the COA analysis, i.e. "whether jurists of reason could conclude that the District Court's dismissal on procedural grounds was debatable or incorrect." *Id.* Given the responsibilities that immediate appellate

---

2. Although the date of the published opinion is February 4, 1999, *see State v. Rouse*, 350 N.C. 104, 531 S.E.2d 830 (1999), the record reflects and the State concedes that the order was actually entered on February 5, 1999.

courts shoulder under the COA framework, however, it seems prudent to follow the approach of our sister circuits and take a "quick look" at Rouse's constitutional claims to determine if any of these claims "facially allege the 'denial of a constitutional right'." *Jefferson v. Welborn*, 222 F.3d 286, 289 (7th Cir.2000); *see also Mateo v. United States*, 310 F.3d 39, 41 (1st Cir. 2002); *Valerio v. Crawford*, 306 F.3d 742, 767 (9th Cir.2002) (*en banc* ). If we could conclude that all of his underlying constitutional claims were "utterly without merit, we could affirm the dismissal on that alternative ground." *Jefferson*, 222 F.3d at 289. Thus, the "quick look" approach "reflects the same impulse as *Slack* to protect nascent constitutional claims" yet quickly dismiss all habeas petitions that clearly do not meet the COA standard. *Mateo*, 310 F.3d at 41.

Applying a "quick look" to the limited record before us reveals that at least one of Rouse's claims—the allegations of juror bias—facially alleges the denial of a constitutional right. For this reason, at the very least, "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," *Slack*, 529 U.S. at 484, 120 S.Ct. 1595, and so we cannot deny a COA on the ground that Rouse has failed to state a valid constitutional claim. Accordingly, we turn our attention to the second threshold inquiry: whether the district court "was correct in its procedural ruling." *Id.*

Rouse contends that both the district court's holding that his habeas petition was not timely and the court's refusal to toll the statute of limitations were incorrect. We consider each of these contentions in turn.

## III.

According to Rouse, the district court committed two separate legal errors in ruling that he filed his petition late.

### A.

■ Initially, Rouse maintains that, although the Supreme Court of North Carolina denied certiorari on February 5, 1999, his state post-conviction review remained "pending" under the AEDPA past that date, delaying the start of the one-year period in which he could have filed a timely petition. *See* 28 U.S.C.A. § 2244(d)(2); *Hernandez*, 225 F.3d at 439. He provides two theories to support this view.

Rouse first contends that his motion for appropriate relief remained pending for twenty days after certiorari was denied, until February 25, 1999, because North Carolina procedural rules state that an appellate mandate should issue twenty days after an opinion. North Carolina Rule of Appellate Procedure 32(b) provides that "[u]nless a court orders otherwise, its clerk shall enter judgment and issue the mandate of the court 20 days after the written opinion of the court has been filed with the clerk." N.C. R.App. P. 32(b). Rouse claims that the mandate did not issue on the Supreme Court's denial of certiorari in his case until February 25— but he has submitted no evidence that any mandate ever issued in his case. In fact, as the clerk of the Supreme Court of North Carolina explained in an affidavit, the general practice of that court is that Rule 32(b) mandates do not issue after summary denials of certiorari, such as the order in which the court denied certiorari in Rouse's case. *Cf. Felton v. Barnett*, 912 F.2d 92, 95 (4th Cir.1990) (concluding that a "denial of certiorari [from the Supreme Court of North Carolina] is not to be given the effect of a judgment on the merits" (internal quotation marks and citation omitted)). We agree with Rouse that the inapplicability of Rule 32(b) is less than

clear, and that he could hardly be expected to know the practice of the clerk's office. In the absence of evidence that a mandate issued in Rouse's case, however, and given the uncontroverted testimony that the court generally does not issue a Rule 32(b) mandate after denying certiorari, Rouse has not shown that Rule 32(b) extended the period in which his post-conviction motion was "pending" in state court.

■ Rouse also argues that his post-conviction review remained pending during the period in which he could have sought rehearing from the Supreme Court of North Carolina. North Carolina law does not support this claim. Petitions for rehearing were not (and are not) available in criminal matters, see N.C. R.App. P. 31(g), and a North Carolina statute declares that a motion for appropriate relief is part of the original action. See N.C. Gen.Stat. § 15A–1411(b) (2001). In Rouse's case, the original action was his criminal trial, and so there was no period in which he could have sought rehearing. Rouse points out that the Supreme Court of North Carolina "has used its discretionary authority to reconsider denials of petitions . . . in capital cases." Reply Brief at 10. In his case, however, he did not seek such review, and the Supreme Court of North Carolina did not choose to reconsider its own denial. Rule 31, like Rule 32(b), thus does not extend the pendency of Rouse's motion for state post-conviction review.

## B.

Rouse bases his second timeliness argument on the "mailbox rule" contained in Federal Rule of Civil Procedure 6(e). He argues that this rule extended by three days the deadline for filing his habeas petition.

■■ Rule 6(e) adds three days to a prescribed period "[w]henever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is served upon the party" by mail or other means allowed under the rule. Fed. R.Civ.P. 6(e) (2002). But the AEDPA's limitations period begins to run when a state court denies a petition for certiorari, not when a petitioner receives notice of the denial. See Geraci v. Senkowski, 211 F.3d 6, 9 (2d Cir.2000); see also Spencer v. Sutton, 239 F.3d 626, 627–29 (4th Cir. 2001). (Again, we recognize the facial plausibility of Rouse's theory, as the opinions we cite on this point did not issue until after Rouse had filed his petition—but that does not limit their applicability to his case.) Moreover, although total lack of notice of a state court's denial of relief may assist a habeas petitioner under some circumstances, see Knight v. Schofield, 292 F.3d 709, 711 (11th Cir.2002); Hollins v. Dep't of Corrs., 191 F.3d 1324, 1326–28 (11th Cir.1999), Rouse had actual notice of the state court's denial in the early days of the one-year period in which he could have timely filed his petition.

We thus conclude that the district court correctly held that Rouse's petition was filed one day late. See 28 U.S.C.A. § 2244(d) (imposing a one-year statute of limitations); Fed.R.Civ.P. 6(a) (extending a deadline that falls on a non-working day to the next working day); Hernandez, 225 F.3d at 437 (noting that "for prisoners whose convictions became final prior to AEDPA's enactment, the limitations period began to run with AEDPA's effective date"); id. at 439 (applying Federal Rule of Civil Procedure 6(a) to habeas petitions). Rouse's counsel apparently relied on two plausible, but ultimately untenable, legal theories to commit an error with devastating consequences.

IV.

■ Alternatively, Rouse maintains that, in light of his former counsel's incompetence, the lack of clarity as to when the limitations period began, the brevity of the delay in filing the petition, the lack of prejudice to the State, the compelling nature of his juror bias claim, and the death sentence he faces, the district court incorrectly refused to toll the statute of limitations by one day. "We review de novo the district court's decision not to apply the doctrine of equitable tolling inasmuch as the [relevant] facts in this case are undisputed and the district court determined as a matter of law that there were no grounds that would justify equitable tolling in [this] case." *Dunlap v. United States*, 250 F.3d 1001, 1007 (6th Cir.2001) (citation omitted); *see, e.g., Spencer*, 239 F.3d at 629–31 (applying de novo review to a legal issue in equitable tolling analysis and holding that "the district court erred [rather than abused its discretion] in not tolling the statute of limitations for the entire period from Spencer's initial filing of his second MAR on April 23, 1997, until its final disposition on January 13, 1999"); *Harris v. Hutchinson*, 209 F.3d 325, 330–31 (4th Cir.2000) (applying de novo review in equitable tolling analysis).[3]

■ "Equitable tolling is a background rule that informs . . . construction of federal statutes of limitations. . . ." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 122 S.Ct. 999, 1010 n. 5, 152 L.Ed.2d 27 (2002) (Stevens, J., dissenting). In imposing a statute of limitations on federal habeas petitions in the AEDPA, Congress must

have accepted the possibility that some cases would receive no federal habeas review. *See* 28 U.S.C.A. § 2244(d). But like every circuit to consider the question, we have concluded that Congress did not eliminate a court's equitable power to toll the statute in the interest of justice, and that the AEDPA's statute of limitations is subject to equitable tolling. *See Harris*, 209 F.3d at 329–30 (so holding and collecting cases); *see also Dunlap*, 250 F.3d at 1007 (so holding); *Allen v. Mitchell*, 276 F.3d 183, 187 n. 3 (4th Cir.2001) (noting that "the statute of limitations established by § 2244(d) is not jurisdictional"). Thus, in appropriate cases, equitable tolling of the AEDPA's limitations period is within a court's power.

Several factors would seem to support tolling in this case.[4] Rouse has diligently pursued every previous avenue of review available to him. *Cf., e.g., Spencer*, 239 F.3d at 630 (finding "delay[ ] at every juncture of [Spencer's] post-plea, state and federal proceedings"). Moreover, the record reveals that Rouse himself neither knew of nor consented to a late filing of his federal habeas petition, and no evidence suggests that the late filing was a tactical decision of counsel. Rather, Rouse's former counsel confronted last-minute difficulties and, without Rouse's knowledge, made an appalling error in calculating the limitations period. Furthermore, the State has made no showing that it has been prejudiced in any way by the one-day delay in the filing of Rouse's first habeas

---

**3.** The dissent notes that in *Spencer* and *Harris*, we did not "explicitly articulate or discuss the proper standard of review" in equitable tolling cases. *Post* at n. 4. That is true. However, any fair reading of *Spencer* and *Harris* leads to the inescapable conclusion that in both of those habeas cases we applied *de novo* review in holding that § 2244(d) should not be equitably tolled. To apply a different standard here would, therefore, be clearly contrary to circuit precedent.

**4.** We reject Rouse's claim that his health supports tolling. Rouse's former counsel filed his habeas petition on February 8, 2000, and Rouse simply provides no reason why his medical condition barred filing only one day earlier.

petition, and it is hard to imagine that such a showing could be made.

█ If Rouse had offered only these reasons, however, our precedent might well have foreclosed the application of equitable tolling in this case. We have held that a "mistake by a party's counsel in interpreting a statute of limitations does not present the extraordinary circumstance beyond the party's control where equity should step in to give the party the benefit of his erroneous understanding." *See Harris*, 209 F.3d at 331; *accord Spencer*, 239 F.3d at 628–29. But we reached this conclusion in non-capital cases, involving greater delay, and far less compelling habeas claims that had received at least one hearing in state court. *Id.* Moreover, in so holding, we expressly recognized that equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case" and, therefore, "does not lend itself to bright-line rules." *Harris*, 209 F.3d at 330 (quoting *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir.1999)). Indeed, we explained that, although some statutes of limitations "serve[ ] policy interests that would be adversely affected if the statutory limitations provisions were not *strictly* adhered to," the habeas context is different, warranting greater flexibility in the application of the AEDPA's statute of limitations. *Id.* at 329 (emphasis added).

 Thus, in determining whether to exercise its equitable power to toll the statute of limitations here, the district court was required under *Harris* to consider the particular "facts and circumstances" of Rouse's case. They are com-

pelling. Rouse filed his petition only one day late.[5] *Cf. Spencer*, 239 F.3d at 631 (five days late); *Harris*, 209 F.3d at 328 (six months late). Although the petition was late, his counsel's disastrous error rested on plausible, albeit incorrect, legal theories, some of which have since been clarified. *See Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir.2001) (noting lack of clarity in the relevant law and plausibility of a petitioner's legal theory in equitably tolling the AEDPA), *cert. denied*, 534 U.S. 944, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001). Moreover, Rouse has *never* received a hearing on his habeas claims, in any forum—state or federal. *Cf. Spencer*, 239 F.3d at 627–28 (two evidentiary hearings in state court); Brief for Appellant in *Harris*, 209 F.3d 325, at 326 (evidentiary hearing in state court). Without equitable tolling, he will lose any hope of receiving such a hearing and will be afforded no federal habeas review at all.

Furthermore, Rouse presents what must be considered on its face a powerful constitutional claim: that a juror's personal vengeance and racial bias infected his death sentence. To date, he has never received, even post-sentence, any opportunity to explore at a hearing—before any court—the evidence that one of his jurors harbored an invidious prejudice against African–Americans, the evidence as to the potential effect of the sexual assault and murder of the juror's mother on his impartiality, or the evidence that in fact the juror concealed active bias—all matters that may require credibility determinations. If proved, these facts support a strong constitutional claim. *See Morgan v. Illinois*, 504 U.S.

---

5. For reasons implicit in our earlier discussion of prejudice to the State, we reject a suggestion by the Fifth Circuit that the length of a petitioner's delay is not a relevant consideration in equitable tolling analysis. *See Lookingbill v. Cockrell*, 293 F.3d 256, 264–65 (5th Cir.2002), *petition for cert. filed*, (U.S.

Sept. 17, 2002) (No. 02–6969). A court considering equitable tolling should consider the length of a petitioner's delay, to ensure adequate attention to the possibility of prejudice to the State, in the case of lengthy delays, and to ensure fairness to the petitioner, in the case of very short ones.

719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (reviewing the "strictures dictated by the Sixth and Fourteenth Amendments to ensure the impartiality of any jury that will undertake capital sentencing" (emphasis omitted)); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *Rosales–Lopez v. United States*, 451 U.S. 182, 190–91, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). To be sure, the State presented sufficient evidence to prove Rouse guilty of these terrible crimes, and a federal court might conclude that Rouse's habeas claims, including his juror bias claim, lack merit even with respect to his sentencing—but at present, no federal court has ever examined any of his habeas claims.[6]

▮ Moreover, the sentence that is assertedly tainted by racial and personal bias is a death sentence. Until today, we have not had occasion to consider equitable tolling in a habeas case involving a sentence of death. *Cf. Spencer*, 239 F.3d at 627 (life sentence); *Harris*, 209 F.3d at 326 (same). We have, however, implicitly recognized that the presence of a death sentence affects the equitable tolling analysis. Thus, in holding that equitable tolling is proper under the AEDPA, we have cited, with approval, the statement that although in some contexts, strict limitations rules may have to yield "occasional injustices" "in order to maintain a workable regime," these "occasional injustices ... are decidedly *not* an acceptable cost of doing business in death penalty cases." *Harris*, 209 F.3d at 329 (citing *Calderon v. United States Dist. Court for the Cent. Dist. of Cal. (Beeler)*, 128 F.3d 1283, 1288 n. 4 (9th Cir.1997) (internal quotation marks and citations omitted; emphasis added), *over-*

**6.** As noted above, the district court did not even have the opportunity to examine the decision of the state post-conviction court. That decision was submitted to us late in the appellate litigation of this case, after the case had been argued once. On examining it, we can only conclude that even if it *had* been before the district court, it would *not* have lessened the compelling nature of Rouse's juror bias claim at this preliminary stage. This is so because the state post-conviction court appears to have disposed of this claim, without a hearing, on the basis of a credibility determination. After noting "that the acoustics in the courtroom where defendant was tried sometimes makes hearing difficult," the state court concluded that the juror "did not hear" a question as to whether any juror had a relative who had been a victim of a violent crime. Yet the following facts contradict this conclusion: (1) the juror's admission that "I knew that if I disclosed what had happened to my mother, I would be excused from serving ... I wanted to serve, ... so I did not reveal the information"; (2) the state post-conviction court's acknowledgment of this admission; (3) the court's express finding (substantiated by the voir dire transcript) that *all* prospective jurors were asked if they had "been a

victim of any kind of violent crime or any family members or any close relative ever been a victim of a violent crime"; (4) the court's further express finding that the transcript reflected no response to that question; and (5) the court's acknowledgment that immediately after the group question about family victims, prospective jurors were told that the trial "involv[ed] a first-degree murder, armed robbery, and rape" (information the juror plainly took in, based on his knowledge of the nature of the trial and his resulting admitted desire to serve on the jury). Indeed, the state court found that the juror "did not hear" the question although not even the juror himself made this claim directly; instead the juror simply stated in writing that he was not "congniznant [sic] of any jurors' group questioning ... on this subject." Therefore, the state court apparently reached its dispositive finding, a credibility determination that contradicts the official written record of the voir dire, without the benefit of face-to-face consideration of any sort, without a hearing, and without even a direct assertion by the juror in support of the finding. *See* 28 U.S.C.A. § 2254(d)(2), (e)(1) (West Supp. 2002) (governing federal habeas review of state-court factual findings under AEDPA).

*ruled on other grounds,* 163 F.3d 530 (9th Cir.1998) (en banc)).[7]

The fact is that death is different. The phrase itself is timeworn and familiar—because it is true. Like the Supreme Court, we must recognize that "in its finality," death "differs more from life imprisonment than a 100–year prison term differs from one of only a year or two." *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). For this reason, the death penalty presents different and far more serious concerns than any other sanction. *See, e.g., Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 2441, 153 L.Ed.2d 556 (2002) ("[T]here is no doubt that '[d]eath is different.'" (citation omitted)); *Gardner v. Florida,* 430 U.S. 349, 357, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (stating that "death is a different kind of punishment") (opinion of Stevens, Stewart, and Powell, JJ.); *see also Bracy v. Schomig,* 286 F.3d 406, 415 (7th Cir.2002) (en banc) ("[W]e are again mindful that death is indeed different."), *cert. denied,* —— U.S. ——, 123 S.Ct. 169, 154 L.Ed.2d 161 (2002). In short, the conclusion "that 'death is different' ... mean[s] that the firm view of our society demands that it be treated differently in certain identifiable respects...." *Thompson v. Oklahoma,* 487 U.S. 815, 877–78, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (Scalia, J., dissenting).

The Supreme Court has emphasized that courts, at all levels, considering the deliberate infliction of death are to act with particular care. The Court has insisted that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination," that is, "the *procedure* by which the State imposes the death sentence," to "ensur[e] that the death penalty is not meted out arbitrarily or capriciously." *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (emphasis in original); *accord Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *see also Bracy,* 286 F.3d at 412 ("Like all others sentenced to death, Bracy and Collins are entitled to our painstaking review of their convictions and death sentence because, as the Supreme Court has often recognized, death is different." (citation omitted)).

Indeed, the Supreme Court itself has been willing "in the interests of justice" to overlook requirements that it would ordinarily impose in non-capital cases. *Eddings v. Oklahoma,* 455 U.S. 104, 117 n. *, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring) (quoting *Wood v. Georgia,* 450 U.S. 261, 265 n. 5, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981)). For example, the Court has treated the requirement that an argument be raised below, ordinarily a prerequisite for appellate review, as merely "technical [ ]." *Id.* (O'Connor, J., concur-

---

**7.** Although other courts have on occasion refused tolling in capital cases, they have done so in cases involving greater (typically much greater) delay, or when petitioners have shown less diligence than Rouse, or both. *See Fierro v. Cockrell,* 294 F.3d 674, 679–80 (5th Cir.2002) (considering a habeas petition filed three months late), *petition for cert. filed,* (U.S. Sept. 7, 2002) (No. 02–6336); *Lookingbill,* 293 F.3d at 264 (considering a habeas petition filed four days late and excused only by counsel's somewhat late appointment and "busy docket"); *Kreutzer v. Bowersox,* 231 F.3d 460, 461–62 (8th Cir.2000) (considering a habeas petition filed two weeks late); *Cantu–Tzin v. Johnson,* 162 F.3d 295, 297–99 (5th Cir.1998) (considering a case in which no habeas petition was ever filed and a motion for stay was filed two months after the deadline for a petition had passed). Regardless of diligence, however, we have found no case in which any circuit refused equitable tolling to a capital petitioner who filed his first federal habeas petition one day late.

ring in the Court's reversal of a death sentence, despite a dissenting argument that the contention had been waived below, "[b]ecause the trial court's failure . . . risks erroneous imposition of the death sentence") (citation omitted); *see id.* at 105, 113 n. 9, 102 S.Ct. 869 (majority opinion) (reversing a death sentence while citing *Wood,* 450 U.S. at 265 n. 5, 101 S.Ct. 1097 (overlooking failure to raise an argument below "in the interests of justice"), in partial response to the dissenting argument of waiver below); *see also Dobbs v. Zant,* 506 U.S. 357, 360, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993) (Scalia, J., concurring) ("I am willing to make an exception from that [previously stated 'general' internal] rule in capital cases—but only where there is a realistic likelihood that the 'technical error' affected the conviction *or the sentence.*" (emphasis added)). Confronting the particular demands of capital cases, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings,* 455 U.S. at 118, 102 S.Ct. 869 (O'Connor, J., concurring).

We look to the Court's example today. Like the Supreme Court, we acknowledge the special demands of cases in which a defendant stands sentenced to death. Given that this case, in which Rouse faces execution, involves the shortest possible delay in filing the habeas petition, a total lack of prejudice to the State, a petitioner who was diligent in all other regards, and habeas claims, including at least one apparently compelling constitutional claim, that will receive no federal habeas review and no hearing in any court if the limitations period is not tolled, we conclude that the district court's refusal to toll the limitations period was indeed "unconscionable." *Harris,* 209 F.3d at 330. If ever a case was suitable for an exercise of a court's discretion—the most minor exercise imaginable, a one-day tolling of a limitations period—surely, this is that case.

In reaching this conclusion, we have considered the limited impact of such a decision, both on our system of justice as a whole, and within this circuit. A number of systemic and legal concerns that are often at the heart of habeas jurisprudence on the merits have no relevance to equitable tolling. In particular, equitable tolling raises none of the concerns related to constitutional interpretation that are sometimes invoked in opposition to a " 'death-is-different' jurisprudence," *Shafer v. South Carolina,* 532 U.S. 36, 55, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001) (Scalia, J., dissenting); *see Simmons v. South Carolina,* 512 U.S. 154, 178–79, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (Scalia, J., joined by Thomas, J., dissenting), and it does not in any way affect the " 'standard of review on federal habeas corpus,' " because AEDPA's stringent standards of review of course still apply. *Herrera v. Collins,* 506 U.S. 390, 405, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (quoting *Murray v. Giarratano,* 492 U.S. 1, 9, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (plurality opinion)); *see* 28 U.S.C.A. § 2254(d), (e) (West Supp.2002). Similarly, equitable tolling of this federal deadline poses no threat of intrusion on a state's enforcement of its own procedural rules, *cf. Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), on a state's legislative choices, *cf. Murray,* 492 U.S. at 13–15, 109 S.Ct. 2765 (O'Connor, J., concurring, and Kennedy, J., concurring in the judgment), or on the prerogatives of the executive branch. *Cf. Ohio Adult Parole Auth. v. Woodard,* 523 U.S. 272, 276, 284–85, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (plurality opinion).

Nor do we see any cause to fear that within our own circuit, equitable tolling in Rouse's case might "loose the rule of law

to whims about the adequacy of excuses, divergent responses to claims of hardship, and subjective notions of fair accommodation." *Harris,* 209 F.3d at 330. Of course, all non-capital petitions continue to be governed by *Harris.* Even in capital cases, the effect of tolling in this case will be slight, for several reasons.

Before or after a holding that limitations should be tolled in Rouse's case, a deliberate decision to file late—to gamble any chance of federal review of a capital petitioner's habeas claims in hopes that equity would slightly extend the deadline—would constitute recklessness of a nature and a magnitude that we decline to impute to our Bar. Thus, the limited precedent established by tolling in this case creates little incentive for habeas petitioners to file after the deadline. Furthermore, even if this were attempted, equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case," *id.* at 330 (internal quotation marks and citation omitted), and application of the doctrine will continue to depend on a court's confidence that "there is no evidence of abuse of the process." *See Fahy,* 240 F.3d at 245. Most importantly, the strength of the claims in a habeas petition obviously affects a court's decision to exercise its equitable power to toll limitations, and few petitioners present claims as facially compelling as Rouse's. *See Lonchar v. Thomas,* 517 U.S. 314, 320, 322, 325, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996) (emphasizing the distinction between habeas claims suitable for summary dismissal and those warranting more attention in reversing a lower court's employment of "special ad hoc 'equitable' reasons not encompassed within the framework" of the Habeas Corpus Rules to bar all consideration of a first federal capital habeas petition); *cf. Spencer,* 239 F.3d at 630 n. 2 (suggesting that petitioner's underlying habeas claim was weak when determining whether district court's tolling decision was correct).

Because this is Rouse's first federal habeas petition, moreover, a court must exercise great care before allowing it to be summarily dismissed. *See Lonchar,* 517 U.S. at 324, 116 S.Ct. 1293 ("Dismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty." (emphasis in original)). Of course, in this case as in any other, the district court on remand remains free to dispose promptly of any claim that it determines lacks merit.

We note that other courts have tolled the AEDPA limitations period in cases involving more egregious delay. In a capital case involving a petition that was thirty-five days late due to attorney error in interpreting debatable procedural provisions, the Third Circuit tolled the precise statute at issue here. *See Fahy,* 240 F.3d at 245; *accord Banks v. Horn,* 271 F.3d 527, 534–35 (3d Cir.2001), *rev'd on other grounds,* 536 U.S. 266, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (applying equitable tolling in a capital case involving a petitioner convicted of murdering thirteen people). The court reasoned that a court "must allow less than 'extraordinary' circumstances to trigger equitable tolling of the AEDPA's statute of limitations when a [capital] petitioner has been diligent in asserting his or her claims and rigid application of the statute would be unfair." *Id.; see also Corjasso v. Ayers,* 278 F.3d 874 (9th Cir.2002) (tolling AEDPA's statute of limitations despite a procedural defect and listing cases); *Lagrone v. Cockrell,* 2002 WL 1968246, at *8–9 (N.D.Tex. Aug.19, 2002); *DeJesus v. Miller,* 215 F.Supp.2d 410, 412 (S.D.N.Y.2002). Like the Third Circuit, we believe it is appropriate that a court toll limitations "under the facts of this capital case where there is no evidence of abuse of the process." *Fahy,* 240 F.3d at 245; *accord Banks,* 271 F.3d at 535. In view of the facts and circumstances of this

capital case, including the brevity of the delay and the apparently compelling nature of an underlying constitutional claim, to do otherwise would be "unconscionable" and might well result in "gross injustice." *Harris,* 209 F.3d at 330.

## V.

Rouse faces his death with reason to believe that one of the twelve citizens entrusted with doing impartial justice in his case sought so eagerly to condemn him that the juror deliberately misled the court by hiding basic facts as to his particular bias against Rouse and his contempt for all African–Americans. In Rouse's interest and in the interest of justice, we will not allow one day's delay to rob a man on death row of all federal habeas review of such a serious and troubling claim. Although tolling will remain extremely infrequent even in capital cases, we must recognize the rare circumstance in which equity demands tolling.

For these reasons, we believe that the district court was incorrect in refusing to toll the statute of limitations by one day. Accordingly, we must grant a certificate of appealability. Whether Rouse can prove his allegations of juror bias, or any of his other underlying claims, remains to be seen. The district court must "make the first assessment of their underlying merit." *Jefferson,* 222 F.3d at 289; *see also Mateo,* 310 F.3d at 41–42. Therefore, we

vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*VACATED AND REMANDED.*

WILLIAMS, Circuit Judge, dissenting.

I agree with the majority's conclusion that Rouse's petition was untimely because it was filed more than one year after the state court denied Rouse's petition for certiorari.[1] I disagree, however, with the majority's conclusion that ordinary attorney error coupled with sensational allegations justifies equitable tolling in capital cases. I would affirm the district court's decision that equitable tolling is not appropriate in this case. Equitable tolling "is appropriate when, but only when, 'extraordinary circumstances beyond [the petitioner's] control prevented him from complying with the statutory time limit.'" *Spencer v. Sutton,* 239 F.3d 626, 630 (4th Cir.2001) (quoting *Harris v. Hutchinson,* 209 F.3d 325, 330 (4th Cir.2000)). Rouse has not shown extraordinary circumstances beyond his control. By allowing ordinary attorney error to equitably toll the limitations period, the majority upsets the careful balance that Congress crafted in the Antiterrorism and Effective Death Penalty Act (AEDPA) statute of limitations, even where, as here, it is plain that the petitioner is guilty and properly convicted of an extraordinarily heinous crime.[2] Thus, I respectfully dissent.

---

1. For prisoners like Rouse, whose criminal convictions preceded enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA), the limitations period began to run with the AEDPA's effective date, April 24, 1996. *Hernandez v. Caldwell,* 225 F.3d 435, 439 (4th Cir.2000). Because Rouse filed his motion for state post-conviction review before April 24, 1996, the statute of limitations was tolled until the conclusion of the state proceeding. 28 U.S.C.A. § 2244(d)(2) (West Supp.2002).

2. The facts as found by the North Carolina Supreme Court are as follows:

[Responding to a call,] [s]everal officers soon arrived at The Pantry [in Asheboro, North Carolina.] [Officer Hinshaw] heard a muffled sound coming from a storage room. He and Sergeant York, who had arrived at the scene, entered the room where they found [Rouse] against a wall. Hinshaw aimed his gun at defendant, and defendant said, "I ain't got nothing, man."

[Rouse] had blood on him, especially on the front of his shirt, his pants, his hands, his waist, his legs and his underwear. There were abrasions on his knees. His pants were unzipped but fastened at the top. His belt

## I.

We may not entertain Rouse's appeal unless we grant a certificate of appealability (COA). 28 U.S.C.A. § 2253(c)(1) (West Supp.2002); *Slack v. McDaniel*, 529 U.S. 473, 482, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *cf. Soto v. United States*, 185 F.3d 48, 51 (2d Cir.1999) (noting that a COA is a jurisdictional prerequisite to appeal in a § 2254 case). "Under AEDPA, a COA may not issue unless 'the applicant has made a substantial showing of the denial of a constitutional right.' " *Slack*, 529 U.S. at 483, 120 S.Ct. 1595 (quoting 28 U.S.C.A. § 2253(c)(2)). In *Slack*, the Supreme Court clarified the showing required to satisfy § 2253(c) where the district court dismisses the petition based on procedural grounds. *See id.* at 484, 120 S.Ct. 1595.

Where a district court "denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* "Section 2253 mandates that both showings be made before the court of appeals may entertain the appeal." *Id.* at 485, 120 S.Ct. 1595. I do not believe that the district court's procedural ruling is debatable, and thus, do not believe that Rouse has made the required showing. Because my friends in the majority, however, have concluded that Rouse has made a substantial showing of the denial of a constitutional right, the COA has been granted.[3] Therefore, I, too, reach the

---

was hanging off. Hinshaw ordered defendant to freeze and pinned him behind the door. Defendant was then handcuffed and taken out of the room. Lieutenant Charles Bulla searched defendant in the store and found in defendant's pocket three rolls of pennies in a plastic container. Defendant was then taken away. Defendant did not resist the officers at this or any time. No odor of alcohol was found on defendant's breath.

On the floor of the storage room was Hazel Colleen Broadway, lying in a pool of blood. She tried to tell Hinshaw something but soon died. Broadway was covered in blood. There were handprints on her body. She was wearing a blouse, and her pants had been pulled down to her feet. . . . [She had] a knife in [her] neck. The blade part of the knife was bent in a ninety-degree angle just below the handle.

More officers soon arrived at the scene who surveyed the store and collected evidence. The store was in disarray. A cigarette stand was overturned, and cigarettes were strewn about the floor. The cash register was turned sideways. Two empty rolls for pennies were on the floor. There was some other debris on the floor beside a trash can and some other penny rolls which seemed to have been knocked out of the safe. The bar stool behind the cash register had some blood on it. There were also spots of blood near the cash register. . . .

. . . [B]lood on defendant's hands, shirt and underwear was consistent with samples of blood taken from the victim. . . .

[The medical examiner] concluded that the victim died as a result of blood loss caused by a stab wound to the left neck, severing the carotid artery and jugular vein. A person could live ten to fifteen minutes after being stabbed in that location. In addition to the lethal knife wound, there were numerous other wounds to the victim including bruises, stab wounds and abrasions to her neck, chest, stomach, arms, shoulders, thighs, knee, palm, thumb, back, and elbow. Many of these were consistent with a sharp cutting instrument. Other injuries were consistent with a blunt instrument.

*State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543, 548 (1994) (direct appeal).

3. I do not read the majority opinion, *ante* at 701, as suggesting that, where the district court denied the petition on procedural grounds, a court of appeals can grant a COA without considering whether the petition states a valid claim of the denial of a constitutional right. I agree that in determining whether this threshold inquiry is satisfied, a court may choose to take only a "quick look" at the petition to determine if it facially alleges the denial of a constitutional right.

merits of the district court's procedural ruling.[4]

The district court dismissed Rouse's petition as untimely because it was filed after the one-year limitations period and "[t]he extant case law does not provide for equitable tolling" based on a "miscalculation by counsel" about the statute of limitations.[5] (J.A. at 330–33.) Rouse argues that equitable tolling should apply because the conduct of his former attorneys was "grossly negligent" and "unprofessional."[6] (Appellant's Br. at 27–28.) Equitable tolling "has been applied in 'two generally distinct kinds of situations. In the first, the plaintiffs were prevented from asserting their claims by some kind of wrongful conduct on the part of the defendant. In the second, extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time.'" *Harris*, 209 F.3d at 330 (quoting *Fisher v. Johnson*, 174 F.3d 710, 713 (9th Cir.1999)). "As a consequence, neither 'excusable neglect' nor ignorance of the law is sufficient to justify equitable tolling." *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir.2002) (quoting *Coleman v. Johnson*, 184 F.3d 398, 402 (5th

4. The majority reviews the district court's decision under a de novo standard of review. *Ante* at 704. In neither *Harris v. Hutchinson*, 209 F.3d 325 (4th Cir.2000), nor *Spencer v. Sutton*, 239 F.3d 626 (4th Cir.2001), did we explicitly articulate or discuss the proper standard of review, and thus, I question whether de novo review was established as binding circuit precedent. *See Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ("[S]ince we have never squarely addressed the issue, and have at most assumed the applicability of [the standard], we are free to address the issue on the merits.") In the non-habeas context, we review the district court's equitable tolling decision for an abuse of discretion. *Chao v. Va. Dep't of Transp.*, 291 F.3d 276, 279–80 (4th Cir.2002).

I note that there is a split among the circuits as to. the proper standard of review. *Compare Fierro v. Cockrell*, 294 F.3d 674, 679 (5th Cir.2002) ("We review the district court's denial of equitable tolling for an abuse of discretion."); *Delaney v. Matesanz*, 264 F.3d 7, 13 (1st Cir.2001) (same); *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) (same), *and cert. denied*, 535 U.S. 973, 122 S.Ct. 1442, 152 L.Ed.2d 385 (2002), *with United States v. Saro*, 252 F.3d 449, 455 n. 9 (D.C.Cir.) (holding that de novo review applies when the district court holds that the facts cannot justify equitable tolling as a matter of law), *cert. denied*, 534 U.S. 1149, 122 S.Ct. 1111, 151 L.Ed.2d 1005 (2001); *Dunlap v. United States*, 250 F.3d 1001, 1007 n. 2 (6th Cir.) ("[W]e hold that where the facts are undisputed or the district court rules as a matter of law that equitable tolling is unavailable, we apply the *de novo* standard of review to a district court's refusal to apply the doctrine of equitable tolling; in all other cases, we apply the abuse of discretion standard."), *cert. denied*, 534 U.S. 1057, 122 S.Ct. 649, 151 L.Ed.2d 566 (2001); *Jihad v. Hvass*, 267 F.3d 803, 806 n. 3 (8th Cir.2001) (applying de novo review because district court treated equitable tolling as an issue of law); *Helton v. Sec'y for Dep't of Corrections*, 259 F.3d 1310, 1312 (11th Cir.2001) ("We review the district court's application of equitable tolling *de novo*, as the question is 'solely one of law.'" (quoting *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir.1999))); *and Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir.1999) ("[W]here, as here, the facts are undisputed as to the question of equitable tolling, we review de novo."). Applying either standard, I would affirm the district court's decision that equitable tolling was inappropriate on the facts of this case. I do not know whether applying the abuse of discretion standard would affect the majority's disposition.

5. The district court referred Rouse's petition to a magistrate judge, pursuant to 28 U.S.C.A. § 636 (West 1993), who submitted a recommendation that the petition be dismissed as untimely. After a de novo review of the magistrate's recommendation, the district court adopted and affirmed the magistrate judge's ruling. (J.A. at 388).

6. Rouse also argues that tolling should apply because of his medical condition during the limitations period. I agree with the majority that Rouse's medical condition does not entitle him to equitable tolling. *See ante* at 704 n. 4.

Cir.1999)). As in *Harris*, there is no allegation in this case that the State of North Carolina contributed in any way to Rouse's delay in filing his petition. "Therefore, to invoke equitable tolling, [Rouse] must be about to point to some other extraordinary circumstance beyond his control that prevented him from complying with the statutory time limit." *Harris*, 209 F.3d at 330.

We recently held, in the context of a habeas petition, that "a mistake by a party's counsel in interpreting a statute of limitations does not present the extraordinary circumstance beyond the party's control where equity should step in to give the party the benefit of his erroneous understanding." *Harris*, 209 F.3d at 331; *see also Fierro*, 294 F.3d at 683 ("[C]ounsel's erroneous interpretation of the statute of limitations provision cannot, by itself, excuse the failure to file [the] habeas petition in the district court within the one-year limitations period."); *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir.2001) ("[A]ttorney error [is] inadequate to create the 'extraordinary' circumstances equitable tolling requires."); *Sandvik v. United*

*States*, 177 F.3d 1269, 1272 (11th Cir.1999) (refusing to apply equitable tolling where late filing was caused by attorney's use of ordinary mail to send petition less than a week before it was due); *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir.1999) (holding that a lawyer's miscalculation of the limitation period was not a valid basis for equitable tolling). As further support for the proposition that attorney error is not an extraordinary circumstance, I note that attorney error during habeas proceedings is not itself a ground for relief in a § 2254 proceeding. *See* 28 U.S.C.A. § 2254(i) (West Supp.2002) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Moreover, the actions of Rouse's attorneys are attributable to Rouse, *see Coleman v. Thompson,* 501 U.S. 722, 753–54, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (explaining that attorney error, short of ineffective assistance of counsel, is, under standard principles of agency, attributable to the client),[7] and thus, do not present "circumstances external to the party's own conduct," *Harris*, 209 F.3d at 330.[8]

---

**7.** In *Coleman v. Thompson,* the Supreme Court explained that attorney error that constitutes ineffective assistance of counsel is not attributable to the petitioner, "not because ... the error is so bad that 'the lawyer ceases to be an agent of the petitioner,'" but rather, because " 'the Sixth Amendment itself requires that responsibility for the default be imputed to the State.'" 501 U.S. 722, 754, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). Rouse did not have a constitutional right to counsel in his federal habeas proceedings; thus, he cannot establish constitutional ineffective assistance of counsel. *See Hunt v. Nuth,* 57 F.3d 1327, 1340 (4th Cir.1995) ("Because Hunt had no constitutional right to an attorney during his federal habeas proceeding, ... he could not establish constitutional ineffective assistance of counsel...."). The statutory right to counsel in habeas proceedings under 21 U.S.C.A. § 848(q)(4) (West 1999)

does not change this result because Rouse bears the risk of attorney error absent a constitutional violation. *Id.* at 1340 n. 22 ("Although Hunt correctly claims that he has a statutory right to counsel in habeas proceedings under 21 U.S.C. § 848, the Supreme Court has held that '[i]n the absence of a *constitutional* violation, the petitioner bears the risk in federal habeas for all attorney error made in the course of the representation ....'" (quoting *Coleman,* 501 U.S. at 754, 111 S.Ct. 2546)).

**8.** Rouse relies heavily on *McLaughlin v. Lee,* No. 5:99–HC–436 (E.D.N.C. Oct. 17 2000) (unpublished) (Attachment 4, Appellant's Br.), in which the district court equitably tolled the one-year limitations period. In that case, McLaughlin's attorneys, as the district court emphasized, "did not make a 'mistake' as to the statutory requirements. Instead, they failed to take any action at all." *Id.* at 7. The court concluded that McLaughlin's attorneys

Because Rouse does not point to any circumstance that was either extraordinary or external to his own conduct, I am satisfied that he is not "a petitioner with a special call on equity," and I would affirm the district court's ruling that equitable tolling is inappropriate on the facts of this case.

## II.

My colleagues in the majority reach a contrary result by concluding that we need not follow our equitable tolling decisions in *Harris v. Hutchinson* and *Spencer v. Sutton* because this is a capital case. *See ante* at 708 (noting that *Harris* would continue to apply in "all non-capital petitions"). After casting aside the restrictions of *Harris*, the majority concludes that the length of Rouse's delay, the lack of an evidentiary hearing, the "plausibility" of Rouse's counsel's legal error, and the "strength" of Rouse's claim justify equitable tolling. *See ante* at 705. I must disagree with the majority on both of these conclusions. The procedural rules for post-conviction review of capital and noncapital cases are the same. Even if we were allowed to create special exceptions for capital cases, by the majority's own criteria, this case would not warrant such treatment because Rouse's claim, which must be evaluated in light of the deference that we are statutorily required to give to state court factual findings and conclusions of law, is far from strong.

## A.

The majority initially lists several reasons why our recent cases applying equitable tolling in the habeas context do not control this case, *see ante* at 705 (noting that *Harris* and *Spencer* were "non-capital cases, involving greater delay, and far less compelling habeas claims that had received at least one hearing in state court"), but concludes that *Harris* continues to apply to *all* noncapital cases, *see ante* at 708 ("Of course, all non-capital petitions continue to be governed by *Harris.*"). To support its position that the equitable tolling analysis should be radically different in capital cases, the majority cites a number of Supreme Court cases for the abstract proposition that "death is different," but the majority ignores the specific holdings of those cases. While it is undeniable that the Court has treated death differently, it has done so primarily by requiring heightened procedural safeguards at *trial.*[9]

Any distinctions between the procedures required in capital and noncapital cases "are primarily relevant to trial," and the Supreme Court "has generally rejected attempts to expand any [such] distinctions further." *Ohio Adult Parole Auth. v. Woodard,* 523 U.S. 272, 281, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (plurality opinion); *see, e.g., Herrera v. Collins,* 506 U.S. 390, 405, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Murray v. Giarratano,* 492 U.S. 1, 8–10, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (plurality opinion); *Satterwhite v. Texas,* 486 U.S. 249, 256–58, 108 S.Ct.

placed him "in the extraordinary situation of believing that he had counsel when, in fact, he had counsel in name only." *Id.*

Even assuming that such utter abandonment constitutes extraordinary circumstances "external to the party's own conduct," *Harris,* 209 F.3d at 330, justifying equitable tolling, those circumstances are not present here. Despite Rouse's attempts to characterize his prior attorneys' conduct as "grossly negli-

gent" and thus akin to such abandonment, it is simply not true that Rouse's attorneys took no action at all. They filed the petition, albeit one day late. Theirs was an ordinary legal error to which the principles of equitable tolling do not apply.

9. Although Rouse's *underlying* claims pertain to his trial, we deal here only with the AEDPA limitations period.

1792, 100 L.Ed.2d 284 (1988); *Smith v. Murray*, 477 U.S. 527, 538–39, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). The Court has, for example, refused to create a special death penalty exception to the traditional harmless error standard of appellate review set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Satterwhite*, 486 U.S. at 256–58, 108 S.Ct. 1792. *Satterwhite* illustrates that even though capital defendants might be entitled to heightened procedural safeguards at trial, the standard of appellate review does not change solely because a capital sentence has been imposed. The Court first explained that capital defendants have a constitutional right to consult with counsel prior to submitting to a psychiatric examination that would determine future dangerousness. *See id.* at 254, 108 S.Ct. 1792. In addressing the error in failing to allow the defendant to consult with his counsel, however, the Court held that traditional harmless error analysis applied even in the capital context. *See id.* at 258, 108 S.Ct. 1792. That is, death made a difference in terms of what procedures the state had to employ at trial but not in the appellate standard of review.

In addition, the Supreme Court has repeatedly declined to treat death differently in the post-conviction context. In *Smith v. Murray*, a capital case, the Court specifically rejected the claim that the principles governing procedural default "apply differently depending on the nature of the penalty a State imposes for the violation of its criminal laws." *Smith*, 477 U.S. at 538, 106 S.Ct. 2661. Similarly, in *Giarratano*, the Court concluded that "the rule of *Pennsylvania v. Finley* [481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)] [that

there is no constitutional right to counsel in state post-conviction proceedings] should apply no differently in capital cases than in noncapital cases." *Giarratano*, 492 U.S. at 10, 109 S.Ct. 2765 (plurality opinion); *see also Herrera*, 506 U.S. at 405, 113 S.Ct. 853 (holding that claims of actual innocence are not grounds for habeas relief even in a capital case and noting that "we have 'refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus' " (quoting *Giarratano*, 492 U.S. at 9, 109 S.Ct. 2765 (plurality opinion))); *cf. Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (applying, in a capital case, the general requirement of cause and prejudice to overcome a state procedural bar).

The cases cited by the majority are not to the contrary. For example, quoting *California v. Ramos*, 463 U.S. 992, 998–99, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the majority states that "the Court has insisted that 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination,' that is, 'the *procedure* by which the State imposes the death sentence,' to 'ensur[e] that the death penalty is not meted out arbitrarily or capriciously.' " *Ante* at 707. As this quotation reveals, "the Court's principal concern has been more with the *procedure* by which the State imposes the sentence." *Ramos*, 463 U.S. at 999, 103 S.Ct. 3446. This fits nicely with the decisions quoted above, which acknowledge that heightened procedural safeguards may be necessary at trial.[10] We deal today with the district court's decision on habeas review not to toll the AEDPA limitations

---

**10.** Similarly, the cases cited by the majority, *ante* at 707, for the proposition that "death is different" involve heightened procedures necessary at trial or sentencing. *See Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 2441–42, 153 L.Ed.2d 556 (2002) (declining to "differentiate capital cases from all others" and holding that "facts increasing punishment be-

yond the maximum authorized by a guilty verdict standing alone ... must be found by a jury"); *Thompson v. Oklahoma*, 487 U.S. 815, 877–78, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (Scalia, J., dissenting) (considering whether capital punishment of fifteen year old violates Eighth Amendment); *Gardner v. Flor-*

period, *not* with *state* capital procedures at trial or sentencing.

Those cases cited by the majority that discuss *appellate* decision-making do not support the majority's position that, in capital cases, the doctrine of equitable tolling allows courts to rewrite the AEDPA statute of limitations. The majority, for example, quotes Justice O'Connor's concurrence in *Eddings v. Oklahoma,* 455 U.S. 104, 117 n. *, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982): "Indeed, the Supreme Court itself has been willing 'in the interests of justice' to overlook requirements that it would ordinarily impose in noncapital cases.... For example, the Court has treated the requirement that an argument be raised below, ordinarily a prerequisite for appellate review, as merely 'technical [ ].' " *Ante* at 707 (alteration supplied by majority). Justice O'Connor's discussion, however, pertained to the question of whether an argument had been waived below, not the far more serious matter of whether to apply a narrow equitable exception to a statutory limitations period enacted by Congress and absolute by its terms.

The majority also quotes Justice Scalia's concurrence in *Dobbs v. Zant,* 506 U.S. 357, 360, 113 S.Ct. 835, 122 L.Ed.2d 103 (1993): "I am willing to make an exception from that [previously stated 'general' internal] rule in capital cases—but only where there is a realistic likelihood that the 'technical error' affected the conviction *or the sentence.*" *Ante* at 708 (emphasis and alterations supplied by majority). The majority fails to note, however, that the "previously stated 'general' internal" rule to which the quoted passage refers is simply the Court's *internal* presumption against granting certiorari in cases that have little importance beyond the parties involved; Justice Scalia certainly did not say that exceptions should be made to *rules of law* in capital cases.

Again, it is true that the Supreme Court has treated death differently in the sense that capital cases call for heightened procedural safeguards at *trial.* But the majority establishes a special capital-case-only rule for determining whether to toll the AEDPA's limitations period. And, as we have explained, the Court has generally refused to apply different standards to capital cases in the habeas context. The majority fails to cite even a single Supreme Court case applying different standards to capital cases on habeas review.[11]

---

ida, 430 U.S. 349, 358, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (holding that the judge cannot "impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel"); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) (holding that mandatory death sentences for first-degree murder are unconstitutional); *Bracy v. Schomig,* 286 F.3d 406, 415 (7th Cir.2002) (en banc) (evaluating judge's actions during sentencing phase of trial), *cert. denied,* —— U.S. ——, 123 S.Ct. 169, 154 L.Ed.2d 161 (2002).

11. The majority suggests that a decision not to toll the limitations period on the facts of this case would be unprecedented. *See ante* at 707 n. 7. As the majority notes, however, other circuits have refused to invoke equitable

tolling in capital cases, holding steady to their previously articulated standards. *See, e.g., Fierro v. Cockrell,* 294 F.3d 674, 682–84 (5th Cir.2002) (denying equitable tolling based on "mistaken assumption" regarding statute of limitations), *petition for cert. filed* (Sept. 7, 2002) *status available at* www.supremecourtus.gov/docket/02–6336.htm; *Lookingbill v. Cockrell,* 293 F.3d 256, 263–65 (5th Cir.2002) (denying equitable tolling for "garden variety claim[s] of excusable neglect"), *petition for cert. filed* (Sept. 17, 2002), *status available at* www. supremecourtus. gov/docket/02–6969.-htm; *Kreutzer v. Bowersox,* 231 F.3d 460, 463 (8th Cir.2000) (holding that "counsel's confusion about the applicable statute of limitations does not warrant equitable tolling"), *cert. denied,* 534 U.S. 863, 122 S.Ct. 145, 151 L.Ed.2d 97 (2001); *Cantu–Tzin v. Johnson,*

### B.

Even if I were to agree with the majority that the fact that a death sentence has been imposed changes the equitable tolling analysis, the factors that the majority considers do not justify equitable tolling in this case. First, the length of Rouse's delay is irrelevant. "At the margins, all statutes of limitations and filing deadlines appear arbitrary. The AEDPA relies on precise filing deadlines to trigger specific accrual and tolling provisions. Adjusting the deadlines by only a few days in both state and federal courts would make navigating the AEDPA's timetable impossible. Such laxity would reduce predictability and would prevent us from treating the similarly situated equally." *Lookingbill v. Cockrell*, 293 F.3d 256, 264–65 (5th Cir. 2002) (declining to equitably toll when the petition was only four days late); *cf. Spencer*, 239 F.3d at 631 (declining to equitably toll when the petition was only five days late). Second, the lack of a hearing on Rouse's claims cannot be relevant because, as the majority notes, "[i]n imposing a statute of limitations on federal habeas petitions in the AEDPA, Congress must have accepted the possibility that some cases would receive no federal habeas review." *Ante* at 704.

The majority also states that equitable tolling should apply because Rouse's "disastrous error rested on plausible, albeit incorrect, legal theories." *Ante* at 705. The majority cites *Fahy v. Horn*, 240 F.3d 239 (3d Cir.2001), for the proposition that reasonable, but incorrect, interpretations of law support equitable tolling. *See ante* at 705, 709. In *Fahy*, however, the law that the petitioner misinterpreted was "inhibitively opaque." *Fahy*, 240 F.3d at 245. Further, the court noted that it had previously decided that it "could not confidently

determine" how the state court would rule; thus, the petitioner's misjudgment was reasonable because "[i]f we could not predict how the Pennsylvania court would rule on this matter, then surely we should not demand such foresight from the petitioner." *Id.* The law underlying Rouse's incorrect theories, as discussed below, was not unclear or inhibitively opaque. Nor had any court in this circuit issued a decision indicating that the law was unclear. Thus, *Fahy* does not support the majority's position that ordinary attorney error justifies equitable tolling if the error was plausible. *Cf. Fierro*, 294 F.3d at 683 ("Although the application and interpretation of the AEDPA statute of limitations was somewhat unsettled during this period, we think that such uncertainty should have militated *against* taking an unnecessary risk by waiting to file a ... habeas petition.").

Moreover, unlike the majority, I do not believe that Rouse's legal theories were plausible. Rouse first argues that, under North Carolina Rule of Appellate Procedure 32(b), the North Carolina Supreme Court's denial of certiorari did not become final until twenty days after the denial was filed when the mandate issued. The majority finds that "the inapplicability of Rule 32(b) is less than clear." *Ante* at 702–03. As the majority notes, however, mandates do not issue after summary denials of certiorari in North Carolina, and more importantly, Rouse has submitted no evidence that any mandate issued in his case. *See ante* at 702–03. Thus, Rule 32(b) clearly did not apply. Rouse also argues that the "mailbox rule" contained in Federal Rule of Civil Procedure 6(e) extended the time for filing his habeas petition. (Appellant's Br. at 13–15.) The majority "[a]gain, ... recognize[s] the facial plausibility of

Rouse's theory." *Ante* at 703; *see also ante* at 703. I cannot agree that this theory was plausible because Rule 6(e) clearly applies only to parties in a federal proceeding and only when "a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party." Fed.R.Civ.P. 6(e). Rouse was not a party to any federal proceeding during the running of the statute of limitations, and the AEDPA statute of limitations runs from "the date on which the judgment became final," 28 U.S.C.A. § 2244(d)(1)(A), not from the date of the service of notice on the party. The tolling of the statute of limitations while a properly filed application for state post-conviction review is pending does not change the fact that the AEDPA limitations period does not begin on the date of service of notice on a party. Thus, even if I agreed that plausible misinterpretations justified equitable tolling, Rouse's theories were not plausible and do not justify equitable tolling.

Finally, the majority contends that "[m]ost importantly, the strength of the claims in a habeas petition obviously affects a court's decision to exercise its equitable power to toll limitations." *Ante* at 709 (citing *Lonchar v. Thomas*, 517 U.S. 314, 320, 322, 325, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996)). But *Lonchar*, a pre-AEDPA case, has nothing at all to do with equitable tolling, and it certainly does not hold that we should consider the strength of the claims in a habeas petition when deciding whether equitable tolling is appropriate.[12] To the extent that *Lonchar* informs the analysis, however, it reinforces my belief that we should follow our equitable tolling decisions that restrict equitable tolling to narrow circumstances not present in this

case. *See Cantu–Tzin v. Johnson*, 162 F.3d 295, 298 (5th Cir.1998) ("[C]onfirmation that a statutory limitations period should be enforced appears in the Supreme Court's ... decision in *Lonchar v. Thomas* ....").

At issue in *Lonchar* was whether "the Court of Appeals properly dismiss[ed][a] first habeas petition for special ad hoc 'equitable' reasons not encompassed within the framework of [Habeas Corpus] Rule 9." *Lonchar*, 517 U.S. at 322, 116 S.Ct. 1293. In concluding that the court of appeals had erred, the Supreme Court stressed that "Congress and the framers of the Rule" undertook a balancing of interests, *"which courts may not undermine through the exercise of background equitable powers." Id.* at 327, 116 S.Ct. 1293 (emphasis added); *see Cantu–Tzin*, 162 F.3d at 298 ("The tenor of the majority discussion in *Lonchar* is that federal courts should not intervene to create equitable reasons for denying stays of execution when federal law and the habeas rules have prescribed principles applicable to the complex mix of equities in capital cases."). Here, no less, by enacting the AEDPA, Congress has balanced the competing interests—a balance embodied in section 2244(d), which provides a one-year limitation period and explicitly specifies conditions under which that period should be tolled. We may not amend that statute "through ... ad hoc judicial exception." *Lonchar*, 517 U.S. at 328, 116 S.Ct. 1293. While we have already held that equitable tolling applies to the AEDPA when extraordinary circumstances beyond the petitioner's control prevent him from filing a timely petition, *see Harris*, 209 F.3d at 329–30, we must refrain from ad hoc alteration of the statutory command. The doc-

---

**12.** Contrary to the majority's assertion, *ante* at 709, *Spencer v. Sutton* does not suggest that the strength of the claim in a habeas petition

affects the decision whether to equitably toll the limitations period.

trine of equitable tolling is not license to suspend enactments of Congress whenever we happen to believe that enforcement of a limitations period would create a hardship. *See id.* (cautioning that "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes").

Even if I were to agree with the majority that the strength of the claims in a petition should affect a court's decision to invoke equitable tolling, Rouse's claims, which must be evaluated in light of the deference that we statutorily are required to give to state court factual findings and conclusions of law, are far from strong.[13] *See* 28 U.S.C.A. §§ 2254(d) (directing that the writ should not be granted for claims adjudicated in state court unless the "decision ... was contrary to, or involved an unreasonable application of, clearly established Federal law"), 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). The majority concludes that Rouse presents a "compelling" claim by relying on Rouse's allegations, *see ante* at 705–06 ("Rouse presents what must be considered on its face a powerful constitutional claim

...."), giving short shrift to the factual findings of the state court that considered Rouse's motion for appropriate relief (MAR) and the deference federal habeas courts owe to state courts, *see ante* at 706 n. 6.

The majority reports that after the trial, Rouse learned that the mother of one of his jurors was murdered, and that "[w]hen all prospective jurors were asked for such information at voir dire, the victim's son had remained silent." *Ante* at 700. Next, on the strength of Rouse's bare allegations and the affidavit of a law student who spoke with the juror four years after Rouse's trial ended, the majority states that "this juror assertedly expressed intense racial prejudice against African–Americans." *Ante* at 700; *see also ante* at 710 ("[T]he juror deliberately ... hid[ ] ... his contempt for all African–Americans.").

The majority does not provide the clear and convincing evidence necessary for disturbing the State MAR court's specific finding that the juror did not hear the question asked at voir dire about connections to victims of violent crimes. *See North Carolina v. Rouse,* No. 91–CRS–3316–17 (N.C.Super.Ct. Aug. 2, 1996) (unpublished) (MAR Court) at 6–7, 15.[14] Nor, of course, does the majority so much as allude to the State MAR court's finding

13. A "strong" or "compelling" claim, presumably, must mean one that is at least likely to result in the granting of a writ. Although a court may choose to only take a "quick look" at the constitutional claim in the petition in determining whether a COA should be granted, once the COA is granted and the appeal entertained, this "quick look" procedure no longer applies. Thus, if the strength of a petitioner's claims is relevant to an equitable tolling analysis, the strength of the claims must be evaluated in light of the deference a court is required to give to state court factual findings and conclusions of law.

14. Similarly, the majority notes that "this juror allegedly stated that he had intentionally concealed his mother's tragic death and carefully crafted his other responses to voir dire questions, because he wanted to be on the jury." *Ante* at 700. It is true, as the juror admitted in his own affidavit, that he did not *volunteer* information. But the State MAR court found that the record did not support the contention that the juror "deliberately failed to answer honestly a material question on voir dire." *See North Carolina v. Rouse,* No. 91–CRS–3316–17, 14–15 (N.C.Super.Ct. Aug. 2, 1996) (unpublished) (internal quotation omitted).

that the juror "was questioned extensively during voir dire about his views on race [ ] [and that] [h]is responses unequivocally indicate that he was not biased toward members of defendant's race." MAR Court at 16. Further, the majority does not mention the State MAR Court's findings that the law student affidavit does not indicate that the juror concealed information on voir dire because the affidavit does not show that the juror was biased at the time of the trial, and thus, that the law student affidavit is inadmissible under N.C. Gen. Stat. § 8C–1, Rule 606(b) (2001). *See* MAR Court at 17 (citing *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306, 330 (1994)).[15]

Moreover, the majority does not and cannot show that the State MAR court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.A. § 2254(d)(1).[16] But that is precisely what the majority must do to maintain that Rouse has presented a strong claim for relief; the district court would have had to answer this question affirmatively in order to consider granting the writ.

The majority cites *Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), in support of its assertion that Rouse has advanced a strong juror misconduct claim, but the state court decision was not contrary to, or an unreasonable application of, these cases. *Morgan* dealt with whether a trial court, conducting voir dire, may "refuse inquiry into whether a potential juror would automatically impose the death penalty upon conviction," 504 U.S. at 721, 112 S.Ct. 2222; the Court held that it could not, *see id.* at 735, 112 S.Ct. 2222. In Rouse's case, the attorneys, rather than the court, conducted voir dire, and nothing prevented them from undertaking such inquiries.

In *McDonough*, the Court "h[eld] that to obtain a new trial [in light of an honest though mistaken answer given by a juror during voir dire], a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." 464 U.S. at 556, 104 S.Ct. 845. As noted above, under the facts

**15.** I note here that I do not mean to intimate a cavalier attitude toward racially biased jurors. Rather, I recognize that Rouse's attorneys had the opportunity to, and in fact did, explore the jurors' racial biases during voir dire. Where there is no evidence that the juror deliberately lied during voir dire, the state MAR court held that North Carolina law does not admit evidence of the juror's internal ideas and belief. *See* MAR Court at 17; *see also* N.C. Gen.Stat. § 8C–1, Rule 606(b); *State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306, 330 (1994) ("This Court has unequivocally held that '[a]llowing jurors to impeach their verdict by revealing their 'ideas' and 'beliefs' influencing their verdict is not supported by case law, nor is it sound public policy.'" (quoting *State v. Quesinberry*, 325 N.C. 125, 381 S.E.2d 681, 688 (1989), *sentence vacated*

*on other grounds*, 494 U.S. 1022, 110 S.Ct. 1465, 108 L.Ed.2d 603 (1990))). Although the state evidentiary rule cannot serve as an adequate basis for the court's decision if the state evidentiary rule is contrary to the federal Constitution, *see Doan v. Brigano*, 237 F.3d 722, 728 (6th Cir.2001), I do not believe that the Constitution requires admission of evidence that, four years after the juror was questioned on voir dire and served on the jury, the juror is allegedly biased.

**16.** Certainly no Supreme Court case cited by the majority stands for the proposition that relief is warranted on grounds of juror misconduct when a potential juror, who has truthfully answered every question directly asked of him, does not answer a question that he did not hear asked.

as found by the State MAR court, it cannot be said that the juror "failed to answer honestly." As to the second prong, after carefully analyzing the law, including McDonough, *see* MAR Court at 9–14, the State MAR court found that "[t]he record and the defendant's affidavits ... demonstrate" that the "mere disclosure by [the juror] of the fact that his mother had been murdered in 1954 would not have been a valid basis for a challenge for cause," *id.* at 15, 16. In light of *actual* Supreme Court precedent and the *facts* as found by the State MAR court, it strains credulity to conclude, as the majority does, that Rouse's claims are strong.

Thus, I disagree with the majority's conclusion that a different equitable tolling analysis should apply to this case because it is a capital case. Moreover, even were I to consider all of the factors that the majority claims should affect the equitable tolling analysis in capital cases, I would still affirm the district court's decision that equitable tolling was inappropriate on the facts of this case.

### III.

Because Rouse has failed to show any extraordinary circumstances external to his own conduct that would justify equitable tolling, I would affirm the district court.